CONGER, Appellant, vs. WALLIS and another, Respondents.

*April 6—October 16, 1923.*

*Fraud: Corporate officers: Purchase of stock: Evidence.*

The evidence in this case is *held* not to show either actual or constructive fraud on the part of certain officers of a corporation in inducing the plaintiff to sell his stock to the president for the purpose of consolidating the business of the corporation with that of another company in which it owned stock, preliminary to the organization of a new corporation for the purpose of acquiring the stock in both companies; and it is also *held* not to show a fraudulent withholding of information from the plaintiff on the part of the officers. VINJE, C. J., and JONES and CROWNHART, JJ., dissent.

APPEAL from a judgment of the circuit court for Milwaukee county: A. H. REID, Judge. *Affirmed.*

Plaintiff seeks to recover damages for an alleged fraud, either actual or constructive, of the defendants *Henry M. Wallis* and *William C. Quarles* for inducing plaintiff to sell to defendant *Wallis* in July, 1919, certain shares of stock then owned by plaintiff in the Wallis Tractor Company and out of the subsequent sale of which defendant *Wallis* is alleged to have made a large profit; defendant *Wallis* at such time and for a long time prior thereto being president and general manager of the said Wallis Tractor Company, and defendant *Quarles* then being a director thereof. The facts are substantially these:

The J. I. Case Plow Works was organized in 1885 and

continuously thereafter engaged in manufacturing agricultural implements at the city of Racine, Wisconsin. The defendant *Wallis* was president of such company from 1895 until the fall of 1919, he and relatives holding more than two thirds of its stock.

In 1912, pursuant to agreement between plaintiff and defendant *Wallis,* the Wallis Tractor Company was organized to manufacture a tractor which plaintiff had developed and to which company he transferred his patents, applications, etc., with reference to such design. The stock of such company was issued to and held by the plaintiff and defendant *Wallis* in agreed proportions, the defendant *Wallis* subscribing and paying for certain of such stock. Thereafter a very close business connection was carried on between these two corporations, and the tractors manufactured by the new company were sold to and used as an aid in disposing of the Plow Works' own product.

In 1913, the stockholders of the Plow Works agreeing thereto, the Plow Works purchased certain shares of the preferred stock of the Tractor Company and paid therefor $149,800, upon which were credited certain advances theretofore made by the Plow Works to the Tractor Company.

In 1916 the Tractor Company moved its plant from Cleveland, Ohio, to Racine, Wisconsin.

Contracts were made at various intervals between the two companies as to the sale to and by the Plow Works of the tractors.

Up to January 1, 1917, the operations of the Tractor Company were conducted at a financial loss. Large profits, however, were made during 1917 and 1918. Large advances were made from time to time by the Plow Works to assist in the financial affairs of the Tractor Company.

The defendant *Wallis* was, during the times material here, president of the two companies.

February 10, 1919, the plaintiff here, as stockholder, began an action in the circuit court for Racine county against

the two corporations and their respective directors in which he sought to have the contracts that had been so made between the two companies set aside and for an accounting by the Plow Works of profits made in the sale of the tractors. Adverse examinations were had of the defendant *Wallis* and other directors and officers of the corporations under sec. 4096, Stats., in March, 1919, and such action was still pending in July and August, 1919.

Examination was had in said action of the records and books of the Tractor Company and information obtained on behalf of the plaintiff as to the affairs, assets, and liabilities of the Tractor Company and to some extent of the Plow Works.

At an adjourned annual meeting of the stockholders of the Tractor Company May 24, 1919, at which meeting the plaintiff was present and represented or controlled 1,386 shares, the defendant *Wallis* and his associates 4,614 shares, of the voting stock, another than plaintiff was elected to succeed plaintiff as director of the Tractor Company.

About June, 1919, the defendants *Wallis* and *Quarles,* the latter being then a director of the Tractor Company and one of the counsel for the two companies, discussed with a member of W. G. Souders & Company, a banking corporation of Chicago, a plan of selling the stock or assets of both companies to a new corporation to be formed by Souders & Company.

June 10th another meeting was had, pursuant to which a written memorandum was drawn and signed reciting, in substance, the proposal to organize a holding company under the laws of Delaware; the organization of a syndicate of investment bankers to underwrite a sufficient number of shares of the holding company so as to purchase all of the capital stock, through defendant *Wallis,* of the J. I. Case Plow Works and the Wallis Tractor Company at a price equal to the appraised book value of the stock in each company at the time of said appraisal, no good will to be in-

cluded; fifty-one per cent. of the no-par-value shares of the holding company to be issued to defendant *Wallis* and forty-nine per cent. to the banking syndicate, the latter to pay the holding company not less than eighty-seven and one-half per cent. of the par value of the preferred stock, which was to be 50,000 shares of a par value of $100, non-voting, the common stock to be 250,000 shares of no par value. It also contained the following provisions:

"And it is understood that *H. M. Wallis* is to endeavor to acquire, under option or otherwise, substantially all of the capital stock of the J. I. Case Plow Works and the Wallis Tractor Company, including both common and preferred, and when so acquired to arrange for the carrying out and consummation of the above proposal as outlined in the undertaking of W. G. Souders & Company. In the event of *H. M. Wallis* not acquiring substantially all of the capital stock of the respective companies mentioned, it is contemplated to sell said holding company the assets of the respective companies under the two-thirds majority right."

"It is understood that the details with reference to the legal phases of the undertaking by each of the parties hereto is to be worked out by their respective counsels to their mutual satisfaction."

Substantial progress was made in carrying out by Souders & Company their part of the understanding and subscriptions were being taken for the stock of the holding company early in July, 1919. Interviews subsequent to June 10th were had between defendant *Wallis* and others with Souders & Company. On July 7, 1919, proper notice was sent to the Tractor Company's stockholders for the holding of a special meeting on July 22d for the purpose of considering the question of refinancing the business of that company and the reorganization or amalgamation or consolidation of it with another company or companies, for the sale of its assets, and such other business of a similar import that might properly come before the meeting. On July 15th, pursuant to notice of a proposed merger or sale of its assets, a stock-

holders' meeting of the Plow Works was held, at which meeting all of its stockholders except one Mrs. Dahlman agreed to give defendant *Wallis* an option to purchase their respective stock holdings of the Plow Works at $300 per share. Mr. George P. Miller of the Milwaukee bar advised with Mrs. Dahlman with reference to her interests, and subsequent to that stockholders' meeting had an interview with defendant *Quarles,* who then represented defendant *Wallis.* At such meeting Mr. Miller insisted that, having information as to the profits made in the last few years, he was convinced that Mrs. Dahlman's stock was worth $571 per share instead of $300 per share, and at which time Mr. Miller requested information as to how far the proposed new arrangement for the financing of the two companies had proceeded, which information was not given. Mr. Miller then offered to place Mrs. Dahlman's stock in the hands of defendant *Wallis* to be disposed of on the same basis and at the same price for which *Mr. Wallis* should be compensated for his interest, which proposition was not accepted.

After plaintiff received the notice of the proposed meeting of the stockholders of the Tractor Company he, with his Cleveland attorney, consulted at Racine with a member of that bar, plaintiff's local counsel. Thereupon, by application in the aforesaid suit then pending in the Racine circuit court, an order to show cause was obtained with a temporary restraining order to enjoin the proposed merger or sale of the assets of the Tractor Company. On Saturday, July 19th, plaintiff discussed the situation with one P. H. Batten, a relative by marriage of defendant *Quarles,* the manager of the Tractor Company, and also the second largest minority stockholder in that company. On Monday, July 21st, plaintiff with his Cleveland counsel interviewed defendants *Wallis* and *Quarles* at the office of the latter in Milwaukee. During part of the time Mr. Batten was present and separately conferred with plaintiff and his counsel. At this interview with defendants statements were made as

to the defendant *Wallis* being an indorser to a large extent on the negotiable paper of the Tractor Company to banks; that he had considerable added to his burden by the recent death of his son-in-law, who had been closely connected with him in business; and that some change was necessary. Plaintiff had no suggestions to offer or make to assist or relieve the situation. It was further stated that interviews or negotiations had been had. with bankers by *Wallis* and that such had expressed themselves as being interested provided the two companies could be handled as a unit but neither could be handled alone, and that defendant *Wallis* would have to associate himself in an executive capacity with any new concern; that such bankers or brokers had notified *Wallis* that they would not deal with a number of directors or stockholders and that they would deal with him as an individual only. Reference was made to the injunction or restraining order obtained by plaintiff on July 18th, and it was stated that the same result there proposed was being accomplished by the position taken on behalf of Mrs. Dahlman as a stockholder in the Plow Works, and that in view of the situation a sale of all the assets of the companies was considered. Certain audits or reports of accountants as to the affairs of the companies were considered at the time.

*Mr. Quarles* was examined as an adverse witness in this action in July, 1921. On the trial in May, 1922, he testified, after having refreshed his recollection as to the interview above related of July 21, 1919, and in addition to what he had testified to in July, 1921, that at such interview the plaintiff asked the defendant *Wallis:* "What are you going to get out of this deal if it goes through?" to which defendant *Wallis* had answered in substance: "I can't tell. If I acquire all the stock of both companies, it will be up to me to see to it that the debts of the two companies are paid. Until that is done I will not be able to determine whether I make or lose, but if I make it is mine, or if I lose I lose."

The plaintiff denied that such statement or anything similar to it was made.

On July 22, 1919, the stockholders' meeting of the Tractor Company was held pursuant to the aforesaid notice, plaintiff attending with his local counsel of Racine, Mr. W. D. Thompson. At such meeting the defendant *Wallis,* for himself and as representing the Plow Works, held a substantial majority of the voting stock of the Tractor Company. A verbatim report of the proceedings at such meeting was kept in the record book of such corporation. It appears from such record and the testimony that a statement was made by *Wallis* as to the purpose of the meeting; that he had been endeavoring to finance the business and could not do so as to the tractor business itself; that he had approached financial friends, who suggested to him an amalgamation of the two companies provided he was willing to join them and manage the new business, and that if he, *Wallis,* would secure options for sixty days upon these two propositions they would sit down and make a deal with him, if possible, for such refinancing; that a point had been reached in these negotiations where it was necessary for him, *Wallis,* to know at what price the Tractor Company, dealing with the stockholders, can be purchased for, and this meeting was called for that purpose primarily; that he had an interview with two of the large minority holders of the Tractor Company's stock and had agreed with them upon a price for the proposed option at par for both common and preferred; that in the Plow Works there had been encountered such minority opposition as to make it impossible to tell whether that stock could be obtained or not, but the success of the plan depends upon the proposition going through jointly and not singly; that it would be better if it can be brought about by all the stockholders selling out. *Mr. Quarles,* answering plaintiff's question, stated that *Mr. Wallis* had the option on all shares of the Plow Works except those of Mrs. Dahlman; and that *Mr. Wallis* and *Mr. Quarles* had

absolutely declined to make any concessions or terms to any one.

The defendant *Wallis* stated that he was president of the company and accepted full responsibility; that he was also a buyer because of this triangular situation. That the bankers would not consider the purchase of these assets, no matter how good they might be, without his becoming interested with them, recognizing the management ability in connection with it, and therefore, in that sense, he, *Wallis,* is a buyer and not a seller.

Mr. Thompson, counsel for plaintiff *Conger,* then stated:

"I understand from *Mr. Quarles* that every stockholder in the Tractor Company who agrees to sell his stock in this syndicate combination will share identically with every other stockholder, including the president, who is likewise a buyer. In other words, the president, or possibly those who are close to him, will get the same price and no more than *Mr. Conger* and outsiders. In other words, there are no secrets in this."

Defendant *Wallis:* "There is a profit I may make in this deal, but if I make I make, and if I lose I lose; and so far as any other stockholder is concerned you are all on an equal basis. They will all sign the same option, but the option runs to me. If I make anything out of it I make it, and if I lose I lose."

Mr. Thompson: "What I mean is this, Mr. President: You put your stock in under this option at the same price everybody else does, and whatever you make you make as an individual and not by virtue of your office as president."

Defendant *Wallis:* "You are correct. I am very glad to have it cleared up, as I don't want any misunderstanding."

Thereupon, after recess, the proposed options being before the stockholders, Mr. Thompson, representing the plaintiff, then stated that "the option would be signed without prejudice to the rights, claims, and position taken by the plaintiff, and without prejudice to any proceeding had or pending in the action pending in the circuit court for Racine county by the plaintiff here, and such would be without prej-

udice to the rights of any of the defendants in said action." Such stipulation was subsequently added to the options plaintiff signed. The options dated July 22, 1919, were then signed and were similar in form for both the preferred and common stock. They in substance provided for the right and option of the defendant *Wallis* of purchasing the respective shares of either preferred or common stock of the Tractor Company for the sum of $100 cash per share for each, upon the conditions, one half on delivery of the stock, and "one half (½) on or before December 1, 1919, this payment to be evidenced by the note of *H. M. Wallis,* secured by an interim certificate for second preferred stock of the company which purchases the assets of said Wallis Tractor Company in an amount as to par value equal to said indebtedness. This option is to be good for the period of sixty days from the date hereof."

In August, 1919, an action was begun by Mrs. Dahlman as stockholder of the Plow Works to rescind such proposed action under such options. Subsequently through negotiations by Souders & Company defendant *Wallis* purchased the Dahlman stock at $450 per share, rather than at $300 per share for the other Plow Works stock.

The terms and conditions of plaintiff's option were subsequently complied with by defendant *Wallis* and payments of $155,100 made to plaintiff.

This action was commenced in July, 1921, against the defendants *Wallis, Quarles,* the two old companies and the new Delaware corporation, and others. It was subsequently dismissed as to all but the defendants *Henry M. Wallis* and *William C. Quarles.*

Upon the trial a great amount of testimony was taken as to the situation of the two corporations here involved and their prior transactions. The trial court, by written decision preliminary to the findings, discussed very fully and carefully the facts as to the situation between the parties, and came to the conclusion that there were no ma-

terial misrepresentations made by defendants to the plaintiff or any failure to make any disclosure which it was defendants' duty to make or any fraudulent procuring of the option.

Thereupon findings were made reciting the facts as above related and quite fully as to what occurred at the meeting at the office of defendant *Quarles* on July 21, 1919, at which plaintiff and his legal counsel were present, and among other things as follows:

"That plaintiff did not make any inquiry as to the details of the negotiations already had between *Wallis* and Souders & Company and asked no questions of *Wallis* which were not truthfully answered; that at the time of this interview plaintiff was a man of intelligence and experience and had associated with others in the tractor business, had at one time been admitted to the bar, and was represented throughout such negotiations by his attorneys, Mr. Day or Mr. W. D. Thompson."

The following findings were also made:

(11) "That prior to the time the plaintiff gave the options his attorney, Thompson, knew or was in a position to know every fact material to the giving of the options other than the details of the negotiations theretofore had with the bankers or capitalists, which details were not inquired about by plaintiff or either of his attorneys."

(12) "That after the termination of the stockholders' meeting of July 22 and while plaintiff was in possession of all of the knowledge hereinabove recited, and with the advice of counsel at his elbow, he, plaintiff, weighed the probabilities of being able to get more out of his stock in some other way than by giving the option which he gave, and quite deliberately concluded to take the certainty of a definite sum which might come to him by a sale under the option, than to take his chances on some other course."

(16) "Plaintiff and defendants throughout all of said negotiations and up to the time of the giving of said options were dealing at arm's length; plaintiff was continuously represented by competent counsel.

"At the time of the giving of his options plaintiff stipu-

lated through his counsel that the suit in equity then pending against *Wallis* and others should not be dismissed until the options were accepted and the stock paid for.

(17) "Plaintiff did not have any reason to believe, and did not in fact believe, that the defendants represented him in any manner as agent or fiduciary in relation to the sale of his stock; he knew that there was no relation of trust or confidence between him and the defendants.

"That said plaintiff and defendants were dealing at all times at arm's length.

"The above facts seem apparent from the fact that litigation had been and was during said negotiations and up to the time of the giving of said options pending between plaintiff, Tractor Company, and Plow Works in respect to which there were sharp contentions between plaintiff and defendants and in which plaintiff had been making diligent investigation into the affairs of the Tractor Company.

"The plaintiff had learned of some proposed amalgamation of the Plow Works and the Tractor Company, and had prior to the giving of said options made a motion in said action for temporary injunction restraining such proposed action, and thereafter, with the aid of counsel, entered into said negotiations for the sale of his stock to defendant *Wallis*.

"Plaintiff was free to inquire just what negotiations had been had with the bankers or capitalists, and just what plan had been proposed or agreed upon, just what price, if any, had been proposed, and any other details, and was quite at liberty to refuse to further negotiate for the sale of his own stock unless his inquiries were fully answered. He chose not to do this, seemed to have deemed them matters more or less private to the defendants, and, facing all of the business chances which the known facts presented to him, he chose to give said options."

(18) "That at the time of the acts in question in this action defendant *Quarles* was a stockholder holding two shares of stock in the Tractor Company and was attorney for the Tractor Company and the Plow Works.

"In June and July, 1919, *Mr. Quarles* was also a director of the Tractor Company. He had no interest in any option given by plaintiff and in no way benefited from the options given by *Conger* to *Wallis*. His financial interest in the mat-

ter was represented by his two shares of stock, and otherwise his interest was only that of attorney for the company."

Upon the findings of fact the court made the following

### Conclusions of Law.

"(1) That no fiduciary relation existed between said *Wallis* and *Quarles* and said plaintiff at the time plaintiff gave the options upon his stock.

"(2) That there was no failure on the part of said defendants, *Wallis* and *Quarles,* to make full disclosure to said plaintiff of all material facts relative to the transaction between the parties.

"(3) That no conspiracy existed between said defendants relative to or in connection with the securing of the options upon plaintiff's stock.

"(4) That no fraud or artifice was practiced by said defendants or either of them in connection with the securing of the options upon plaintiff's stock.

"(5) That said plaintiff has no cause of action against said defendants *Wallis* or *Quarles,* or either of them.

"(6) That this action should be dismissed upon the merits, with costs."

From the judgment entered in accordance therewith the plaintiff has appealed.

For the appellant there was a brief by *Hoyt, Bender & McIntyre* of Milwaukee, and oral argument by *Frank M. Hoyt* and *Walter H. Bender.*

For the respondents there was a brief by *Quarles, Spence & Quarles* of Milwaukee, and oral argument by *Mr. Quarles.*

The following opinions were filed June 18, 1923:

ESCHWEILER, J.    An examination of the record. in this case convinces us that the trial court reached the proper conclusion upon the facts and as to the law.

We deem it unnecessary to discuss more in detail than appears in the above statement of facts the transactions between the parties, there being ample evidence to support the findings of the trial court as to the facts.

At the time of signing the option to defendant *Wallis* to purchase the plaintiff's stock in the Tractor Company the plaintiff here was then plaintiff in an action in the circuit court for Racine county against the defendant *Wallis* and the two old corporations; he there had, with the aid of able counsel, full opportunity to examine into all of the former transactions between the two companies; to learn of their financial situation and the consequent value of the stock.    He knew, from the very language of the option he signed and from the statements then made, that the defendant *Wallis* was to be interested in the new corporation to be formed and that there was to be such a new corporation.    He asked at first more for his stock than defendant was willing to or finally did agree to pay.    The price was the subject of controversy and negotiation between the two. Plaintiff already then knew that he remained no longer director or officer of the Tractor Company because of the election of some one else in his place at the meeting of the preceding May by the majority stockholders with whom he was litigating.    He had at the time of the signing of this option a substantial control to a large extent over the situation by means of his still pending litigation in the Racine circuit court wherein he had sought relief by injunction against this very thing.    With such power and control, and especially over those whom he had elected to treat as adversaries, rather than as trustees, by the Racine litigation, the foundation of which was a declaration and assumption on his part negativing any reliance, so far as the individual stockholder was concerned, that defendant *Wallis* was any longer his trustee, he nevertheless gave to his adversary this option, deposited and surrendered his stock, and took the cash payments therein specified.

We find nothing in the record here presented upon which could be predicated a finding that there was a fraudulent withholding of information which it was the duty of either

the defendant *Wallis* or *Quarles* to disclose to plaintiff under the situation as it existed at the time of the giving of the option. We are not unmindful of the rule stated in *Timme v. Kopmeier,* 162 Wis. 571, 156 N. W. 961, and kindred decisions called to our attention; but under the well recognized doctrine there established there is still in this particular record an absence of showing of any conduct such as would, between the parties here, amount to either actual or constructive fraud, and we are therefore of the opinion that plaintiff established no cause of action and that the trial court correctly so held.

*By the Court.*—Judgment affirmed.

VINJE, C. J., and JONES, J., dissent.

CROWNHART, J. (*dissenting*). This case presents corporate finance at its worst. The defendant *Wallis* represented two masters with opposite interests. Representing the Plow Works he was the buyer of the Tractor Company's products, and representing the Tractor Company he was the seller of its products. As might be expected, he could not fairly represent both, and it appears that he clung to his first love, the Plow Works, with the result that the Plow Works prospered at the expense of the Tractor Company. Naturally there came a time when the minority stockholders in the Tractor Company became dissatisfied and protested. *Wallis* then seems to have conceived the idea of freezing out the minority interests in both companies. He entered into a secret agreement in writing with certain so-called bankers, Souders & Company of Chicago, by the terms of which he was to procure all the stock of both companies, or in lieu thereof he was to sell out the whole assets of both companies so that a new corporation to be organized should acquire all the properties of both companies. The new company was to pay *Wallis* a large sum in cash and deliver to

him a controlling interest in the new company.    *Mr.* *Quarles* learned of this agreement soon after it was made. *Mr. Quarles* was a qualifying director in each company and the attorney for both companies.    *Mr. Wallis* had or controlled a two-thirds majority of the voting stock in each company.

*Wallis,* to carry out the agreement with Souders & Company, had a special meeting called of the Tractor Company stockholders, one of the purposes of which was to sell the properties of the company.    At this meeting he represented his desire to secure options on all the stock of the company not held by him.    He gave as a reason the necessity of refinancing the Tractor Company and the failure to accomplish this otherwise.    He was asked if all the stock was to go into the new company on the same basis, and he replied that it was; that he was both a purchaser and seller, and that he expected to make out of the deal but that he might lose. His answers did not disclose the Souders & Company contract and were evasive and misleading.    He evidently intended to be understood as taking a chance on his holdings in the new company.    He was taking no chance of loss in the exercise of his options.    If he exercised them he knew to a certainty that he would profit some fifty per cent. on the purchase price of the stock, over and above his interest. He finally secured the options, which he later exercised, and he put the stock so purchased into the new company at some fifty per cent. profit over the purchase price.

There are courts which hold that the officers of a corporation have no duty to disclose the true facts in relation to the corporate affairs when purchasing stock from other stockholders, but Wisconsin has adopted a better rule, and that rule is stated by Mr. Justice SIEBECKER, speaking for the full court, in *Timme v. Kopmeier,* 162 Wis. 571, 156 N. W. 961, as follows:

"Directors of a corporation occupy a position of trust and confidence and are considered in the law as standing in a

fiduciary relation toward the stockholders and as trustees for them.  The directors of a corporation are not permitted to use their position of trust and confidence to further their private interests, nor to become parties to contracts concerning corporate affairs intrusted to their management which conflict with a free and impartial discharge of their duties toward the stockholders.  Any participation by them in contracts dealing with matters of corporate interest which is antagonistic to their free and impartial discharge of official duties is denounced by the law, unless all of the stockholders with full knowledge assent thereto."

This rule is well sustained in other jurisdictions.  See *Dawson v. National L. Ins. Co.* 176 Iowa, 362, 157 N. W. 929, where the authorities are collated.

Let us then apply the rule to the facts in this case.  *"The directors of a corporation are not permitted to use their position of trust and confidence to further their private interests, nor to become parties to contracts concerning corporate affairs intrusted to their management which conflict with a free and impartial discharge of their duties toward the stockholders."*

It stands without contradiction that *Wallis* entered into a contract with Souders & Company to dispose of all the stock or property of the Tractor Company to further his private interests.  It cannot be doubted that this contract did conflict with the free and impartial duties he owed to the stockholders for the very simple reason that they were not to participate in the benefits flowing therefrom.  *Wallis* was to skim the cream for himself.  This was a secret contract which *Wallis* did not disclose, even when questions were put to him making it impossible to conceal it without evasion.  *Wallis* withheld information that it was his duty to disclose.  He withheld it to defraud his *cestuis que trust,* and he did defraud them by reason of such concealment. I do not see how there can be any doubt about the facts nor the Wisconsin law as applied thereto.  *Wallis* should be held liable to an accounting.  *Mr. Quarles* occupies a more deli-

cate position than *Wallis*. *Mr. Quarles* occupied a high place at the bar of this court. He was not only an officer of the corporation but its attorney as well. He took an active part in the negotiations as a partisan of *Wallis*. He knew of the Souders & Company contract and concealed the fact from the stockholders. The only thing that can be said for him was that he did not receive any of the profits of the fraud direct. His firm received $2,500 as attorneys' fees in the proceeding. He said he expected to be well paid. I think the cause should be reversed.

I therefore respectfully dissent.

A motion for a rehearing was denied, with $25 costs, on October 16, 1923.