McMynn, Respondent, vs. Peterson, Administratrix, and others, imp., Appellants.

*November 13, 1924—April 7, 1925.*

*Corporations: Relation of officers to stockholders: Duty to honestly disclose state of corporate affairs: Concealment: Fraud: Sale of stock by stockholder to officer: Conspiracy: Rescission: Evidence: Sufficiency.*

1. Officers of a corporation must treat stockholders with fidelity and good faith, and are not privileged to make false statements of corporate affairs or to suppress and conceal its business for the purpose of cheating the stockholders.  p. 467.

2. Situations may arise where full publicity of all the negotiations and business affairs of the corporation may be detrimental to the welfare of the stockholders as a whole; in such cases all that may be required of the officers is the exercise of honest judgment and an honest disclosure in so far as a disclosure is made.  p. 468.

3. The concealment by the president and the treasurer of a corporation of its true financial condition from a stockholder who had written that he had an opportunity to sell his stock and desired to know "what he was selling," and the submission to the stockholder of a false financial statement, pursuant to a conspiracy with other officers to induce the stockholder to sell his stock to such other officers at less than its actual value and at a lower price per share than that at which other parties had agreed to purchase all the stock, constitutes active fraud.  p. 466.

4. The findings of the trial court cannot be disturbed unless contrary to the clear preponderance of the evidence.  p. 469.

5. Proof of fraud is rarely shown by direct proof of intention, but on the contrary the intent to defraud is usually found as an inference from other facts.  p. 469.

6. In an action by the stockholder against the officers of the corporation to rescind a sale of the stock to two of the officers, induced by misrepresentations by another officer as to the condition of the corporation, the evidence is *held* to sustain a finding that all three officers worked together for a common purpose in defrauding plaintiff.  p. 469.

Appeal from a judgment of the circuit court for Milwaukee county: Gustave G. Gehrz, Circuit Judge. *Affirmed.*

This was an action for rescission of contract on the sale of corporate stock. The case was tried before the court, and the following are the findings of fact and conclusions of law upon which judgment was entered accordingly:

### "Findings of fact.

"I find:

"1. That at the times mentioned in the complaint the defendant Richardson-Phenix Company was a corporation duly organized and existing under and by virtue of the laws of Wisconsin, having its place of business at Milwaukee, in said state; the defendant J. William Peterson was and for a number of years theretofore had been the president and treasurer, director and the general manager of said company, and the owner and holder of a majority of the larger part of the capital stock thereof; and the defendant *George M. Dyke* was the auditor and the defendant *Charles H. Bromley* was sales manager of said company, all of whom were actually engaged in the business of said company at its said place of business in Milwaukee.

"2. That the defendant National Exchange Bank was at all times mentioned in the complaint a duly incorporated national bank organized under the laws of the United States and located and engaged in business as such at said city of Milwaukee.

"3. That the defendant S. F. Bowser & Company, Inc., was a corporation organized under the laws of the state of Indiana, having its place of business at the city of Fort Wayne in said state.

"4. That on, and for many years prior to, October 14, 1921, said plaintiff was the owner and holder of 637 shares of the capital stock of said Richardson-Phenix Company, of the par value of ten dollars ($10) each, the entire capital stock of said company, as authorized and issued, being 20,000 shares.

"5. That in August, 1921, said S. F. Bowser & Company, Inc., desiring to acquire said Richardson-Phenix Company and its properties for the purpose of absorbing said Richardson-Phenix Company and merging or consolidating it with said S. F. Bowser & Company, Inc., and to add to its line of manufactured products various apparatus protected by patents manufactured by said Richardson-Phenix Co., S. B.

Bechtel, the vice-president and general manager of said S. F. Bowser & Company, Inc., entered into negotiations with said J. William Peterson to accomplish that purpose by the purchase by said S. F. Bowser & Company, Inc., of all of the capital stock of said Richardson-Phenix Company; and that such negotiations for the purchase of all of the capital stock of said Richardson-Phenix Company by said S. F. Bowser & Company, Inc., were continued by said J. William Peterson, president and general manager of said Richardson-Phenix Company, and said S. B. Bechtel, vice-president and general manager of said S. F. Bowser & Company, Inc., until on either the 22d or 23d day of September, 1921, at the city of Fort Wayne, Indiana, they reached an understanding or tentative agreement for the sale of all of the capital stock of said Richardson-Phenix Company to said S. F. Bowser & Company, Inc., upon the terms and conditions stated in the final written agreement of October 11, 1921, except that such understanding or tentative agreement of September 22d or 23d provided that a portion of the purchase price should be paid in and by common capital stock of said S. F. Bowser & Company, Inc., and that said agreement was reduced to writing and duly executed and delivered by said J. William Peterson as one party, and said S. F. Bowser & Company, Inc., as the other party, on October 11, 1921, in the form of the copy thereof annexed to the complaint, as Exhibit 1 thereof.

"6. That it was understood by said parties on September 22 or 23, 1921, and provided in said written agreement of October 11, 1921, that the price to be paid by said S. F. Bowser & Company, Inc., for all the capital stock of said Richardson-Phenix Company was the book value thereof, as shown by the financial statement of said Richardson-Phenix Company as of date August 31, 1921, furnished by said Richardson-Phenix Company to said S. F. Bowser & Company, Inc., a copy of which statement, as annexed to said contract of October 11, 1921, is made an exhibit of said complaint, subject, however, to verification thereof, as provided in said agreement of October 11, 1921, and as modified by an actual inventory and appraisal of the materials, supplies, manufactured stock and stock in process of manufacture, to be taken as provided in said agreement,

provided that such entire purchase price should not exceed the book value, as shown by said statement of August 31, 1921, to wit: $545,991.46, by more than $10,000.

"7. That the book value of each share of stock of said Richardson-Phenix Company, as determined by said financial statement of August 31, 1921, was about $27.30, and the book value of each share, as determined by the price fixed by said parties under said agreement, to be paid by said S. F. Bowser & Company, Inc., for all of the capital stock of said Richardson-Phenix Company, was $26.75.

"8. That said agreement of S. F. Bowser & Company, Inc., to purchase all of the stock of said Richardson-Phenix Company at its book value, and the opportunity of selling the same by reason thereof at its full book value, greatly increased the value of plaintiff's said stock, and made it worth the full book value thereof.

"9. That after said defendant J. William Peterson returned from Fort Wayne, Indiana, where, on September 22d or 23d, he had reached a tentative agreement for the sale of all of the capital stock of said Richardson-Phenix Company to said S. F. Bowser & Company, Inc., as aforesaid, and on or very shortly before September 26, 1921, said defendants, J. William Peterson, *George M. Dyke,* and *Charles H. Bromley,* conferred together, and at the suggestion of said J. William Peterson agreed to endeavor to purchase of plaintiff his said stock and to divide the same, if purchased, equally between said defendants *George M. Dyke* and *Charles H. Bromley,* and that said defendant *George M. Dyke* should call upon said plaintiff and endeavor to purchase his said stock, in pursuance of said plan and agreement. That said defendant J. William Peterson was interested in and would be benefited by the purchase of plaintiff's stock, pursuant to said plan, because he desired to control said stock in order to be able to deliver it pursuant to said agreement of October 11, 1921; because he had promised each of said defendants *Dyke* and *Bromley* and bound himself to permit them to acquire stock of said Richardson-Phenix Company, and to assist in providing such stock for them, which promise and obligation he desired to keep and discharge; and because he desired said defendants *Dyke* and *Bromley* and not said plaintiff to re-

ceive the increased price for said plaintiff's stock which would result from the sale to said S. F. Bowser & Company, Inc.

"10. That pursuant to said agreement and plan, said defendant *George M. Dyke* called upon the plaintiff September 26, 1921, to solicit and did solicit said plaintiff to sell his said stock; that, thereupon, plaintiff requested said defendant *Dyke* for information concerning the value of said stock and for a late financial statement of said Richardson-Phenix Company, whereupon said defendant *Dyke* requested that plaintiff apply for such information and statement to said defendant J. William Peterson. That immediately and in presence and hearing of said defendant *Dyke,* plaintiff wrote a letter, dated September 26, 1921, addressed to said Richardson-Phenix Company and to the attention of said defendant J. William Peterson, a copy of which is annexed to the complaint as Exhibit 2 thereof, asking for information as to a fair price for said stock and for 'the most recent trial balance, or other record of accounts, which would show the corporation's present financial condition.'

"11. That in response to plaintiff's said request and letter, said defendant J. William Peterson sent to plaintiff a letter dated September 27, 1921, a copy of which is annexed to the complaint as Exhibit 3 thereof, and therewith sent to said plaintiff what purported to be and what said J. William Peterson falsely and fraudulently represented to be, the financial statement showing the actual financial condition of said Richardson-Phenix Company as of August 31, 1921.

"12. That as said defendants J. William Peterson, *George M. Dyke,* and *Charles H. Bromley* well knew, the said statement sent to plaintiff was not its financial statement as of August 31, 1921, but a statement specially prepared by said defendant *George M. Dyke* for said plaintiff, and did not truly show the fair value of the assets of said Richardson-Phenix Company, but showed the same at a valuation greatly depreciated under their true value, although said defendants at the time of preparing said statement had a true financial statement of said Richardson-Phenix Company as of said date of August 31, 1921, to wit: the said statement of said date furnished said S. F.

Bowser & Company, Inc., on or prior to September 22 or 23, 1921, which true statement they fraudulently withheld and concealed from said plaintiff.

"13. That said defendants J. William Peterson, *George M. Dyke,* and *Charles H. Bromley* in and by said letter of September 27, 1921, from said Peterson to said plaintiff, wrongfully and fraudulently falsely represented that no stock had changed hands or been transferred since Mr. Strothman purchased Mr. Burroughs' stock, which was long prior thereto, when in truth and in fact, as they well knew, certain stock of one F. L. Swanberg had been sold and transferred by said Swanberg to said defendant Peterson long subsequent to said purchase by said Strothman of said Burroughs' stock, and only a short time prior to the writing of said letter, Exhibit 3, of defendant Peterson to plaintiff.

"14. That said defendants J. William Peterson, *George M. Dyke,* and *Charles H. Bromley* in and by said letter of September 27, 1921, further wrongfully and fraudulently falsely represented that said defendants Peterson, *Dyke,* and *Bromley* desired the purchase of plaintiff's said stock by said *Dyke* and *Bromley* so that they might be interested in said Richardson-Phenix Company and so that the stock of said company might be held only by those engaged in its business, which would be advantageous to the business of said Richardson-Phenix Company, because they all would draw sufficient salaries to take care of themselves very nicely and would be able to leave the profits in the business to be used in building it up, when in truth and in fact, as they all well knew, they did not desire to purchase plaintiff's stock for such reason or purpose but to obtain for themselves the full value thereof upon said sale to S. F. Bowser & Company, Inc., and to enable said defendant Peterson to perform said agreement as furnished in writing on October 11, 1921, and fraudulently included said false and fraudulent statements in said letter in order to fraudulently conceal from plaintiff said sale to S. F. Bowser & Company, Inc., and their said fraudulent purpose and to fraudulently convey to said plaintiff's mind that the business of said Richardson-Phenix Company would continue under such conditions that said plaintiff would not receive dividends upon his said stock, and therefore that the value thereof was

much less than the book value, they all then and there well knowing and fraudulently concealing the fact that the business of said Richardson-Phenix Company would not be continued under such conditions, and that the same and all of the assets of said company were about to be sold to S. F. Bowser & Company, Inc.

"15. That said defendants J. William Peterson, *George M. Dyke,* and *Charles H. Bromley* in and by said letter of September 27, 1921, further fraudulently represented to plaintiff, in effect, that the value of said stock did not then exceed $15 per share, because of conditions affecting the business of said Richardson-Phenix Company and the operation thereof for several months at a loss, although said defendant Peterson was very hopeful for the future, when in truth and in fact, as they all well knew, the value of said stock because of said negotiations and agreement of October 11, 1921, for the sale of the stock of said Richardson-Phenix Company was then worth its full book value, exceeding $25 per share, and the true value thereof was not dependent upon the then or the future business of said Richardson-Phenix Company, or affected by the mere hope of said defendant Peterson for its future business, and when in truth and in fact, as they well knew, the business of said Richardson-Phenix Company had not been operated at a loss during several months prior to the writing of said letter; and such fraudulent misrepresentations were wilfully and fraudulently included in said letter for the fraudulent purpose of inducing said plaintiff to believe that his said stock was worth less than $15 per share and to fraudulently conceal the true value thereof, the intended sale to said S. F. Bowser & Company, Inc., and the reason or purpose of their desire to purchase the same.

"16. That confidential relations existed between said defendant J. William Peterson and said plaintiff by reason of the fact that said Peterson was such managing officer of said Richardson-Phenix Company and acquainted with all the affairs of said company and said plaintiff was a stockholder thereof, and was, although an experienced lawyer, ignorant of the affairs of said corporation and as to the matters stated in Finding 17, and by reason of the fact that said J. William Peterson, in response to plaintiff's letter requesting it, had undertaken to give to plaintiff informa-

tion concerning the value of his said stock, and by reason of other circumstances surrounding the transaction in question, and it was the duty of said J. William Peterson, in and by said letter of September 27, 1921, or otherwise, to make to said plaintiff a full, complete, and honest disclosure of all of the facts and conditions known to him and unknown to plaintiff, concerning the value of said stock; that said defendant J. William Peterson, in violation of such duty, and said defendants *George M. Dyke* and *Charles H. Bromley*, fraudulently concealed from said plaintiff the fact that said Peterson had negotiated or concluded said agreement for the sale of all of the capital stock of said Richardson-Phenix Company to said S. F. Bowser & Company, Inc., upon terms that would produce to the sellers the full book value of said stock, exceeding $25 per share, and the enhanced value of said stock in consequence thereof.

"17. That as said J. William Peterson, *George M. Dyke,* and *Charles H. Bromley* well knew, said plaintiff at all times until after he had sold and transferred his said stock to said *Dyke* and *Bromley* on the 14th day of October, 1921, was without any knowledge or information of or concerning said agreement for the sale of the stock of said Richardson-Phenix Company to said S. F. Bowser & Company, Inc., or the negotiation therefor, or concerning the value of said stock by reason thereof, none of which matters appeared from any corporate record, or of the truth respecting the fraudulent misrepresentations and concealments of said defendants Peterson, *Dyke,* and *Bromley* as to conditions affecting the value of said stock, as hereinbefore found.

"18. That as said defendants J. William Peterson, *George M. Dyke,* and *Charles H. Bromley* well knew at and before the time plaintiff sold and transferred his said stock, as hereinbefore found, said plaintiff believed and relied upon said misrepresentations and fraudulent conduct of said defendants Peterson, *Dyke,* and *Bromley*, and relied and acted upon impressions created by their said fraudulent concealment and was deceived thereby, and, relying thereon and deceived thereby and without being able with the exercise of due diligence to learn or ascertain the facts, was induced thereby to sell and transfer his said stock to said defendants *George M. Dyke* and *Charles H. Bromley* at a price of $15 per share, on the 14th day of October, 1921.

"19. That before concluding the purchase of plaintiff's said stock each of said defendants *Dyke* and *Bromley* secured a loan at said National Exchange Bank of the entire purchase price to be paid plaintiff for one half of plaintiff's said stock, at $15 per share, with the understanding that said stock would be transferred to said S. F. Bowser & Company, Inc., under said agreement of October 11, 1921, and said loan repaid on January 16, 1922, out of the moneys to be paid said bank by said S. F. Bowser & Company, Inc., upon the performance of said agreement and delivery of the stock deposited in said bank thereunder, and each gave his promissory note to said National Exchange Bank, payable on said date, for one half of the entire purchase price to be paid said plaintiff, with interest.

"20. That upon receiving said stock from plaintiff on said 14th day of October, 1921, said defendants *Dyke* and *Bromley* had the same transferred to themselves in equal shares, upon the books of the Richardson-Phenix Company, and each of them, upon receiving a new certificate therefor, assigned the same, by written assignment on the back thereof, to said S. F. Bowser & Company, Inc., and delivered the same to said National Exchange Bank for delivery to said S. F. Bowser & Company, Inc., under said agreement of October 11, 1921, at the direction of and pursuant to previous arrangements with said defendant J. William Peterson.

"21. That the amount to be paid and actually paid by said S. F. Bowser & Company, Inc., under and pursuant to said agreement of October 11, 1921, for said 637 shares of plaintiff's stock, was $17,039.75, or $7,484.75 in excess of the amount paid by said *Dyke* and *Bromley* to the plaintiff therefor.

"22. That promptly upon learning of said sale to S. F. Bowser & Company, Inc., soon after he had transferred his said stock to said defendants *Dyke* and *Bromley,* as aforesaid, said plaintiff demanded the return of his said stock, and brought this action for the rescission of the sale thereof by him to them; and that said defendants, by their counsel, expressly waived the tender to them of said purchase price paid him for said stock, as aforesaid, with interest, and that in this action plaintiff obtained an injunctional order restraining the delivery of said stock to said S. F. Bowser & Company, Inc., under said agreement of October 11, 1921.

"23. That thereafter it was provided, by stipulations of the parties and the order of said court, that plaintiff's said stock might be delivered by said National Exchange Bank, escrow holder thereof, under the provisions of said agreement of October 11, 1921, to said S. F. Bowser & Co., Inc., upon receipt of said sum to be paid by said S. F. Bowser & Co., Inc., therefor, to wit, $17,039.75, and that the amount due said National Exchange Bank upon said notes of *Dyke* and *Bromley,* with interest, might be deducted and retained by said bank in payment of said notes; and that the balance, amounting to $7,009.07, should be retained by said National Exchange Bank and invested in bonds or securities of the United States government and held in lieu of said stock, subject to be delivered with interest collected thereon to said plaintiff in case of the rescission of said sale; and that said National Exchange Bank now holds said fund so invested, pursuant to such stipulations and order.

"24. That on July 24, 1923, while this action was pending, said defendant J. William Peterson died intestate, and said defendant *Harriet Peterson,* his widow, was appointed and duly qualified as administratrix of his estate, August 7, 1923, and that on or about said date letters of administration were duly issued to her out of the county court of said county of Milwaukee, and that thereafter this action was duly revived and continued against her as such administratrix, and she, as such administratrix, was duly made a party to this action.

"And I find and decide as

*"Conclusions of law.*

"1. That because of the confidential and fiduciary relations existing between said defendant J. William Peterson and said plaintiff, it was the duty of said Peterson to disclose to said plaintiff in his letter of September 27, 1921, or thereafter, and before concluding said purchase of plaintiff's stock, the negotiations and agreement for the sale of the stock of Richardson-Phenix Company to S. F. Bowser & Company, Inc.

"2. That the sale and transfer of plaintiff's stock by him to the defendants *Dyke* and *Bromley,* October 14, 1921, was procured by fraudulent misrepresentations and concealment of said defendants, and that said defendants *Dyke* and *Bromley,* by reason of their participation therein, and by

reason of their actual knowledge, before the consummation of such sale and transfer, that it was procured by the fraudulent concealment of said Peterson, are equally responsible and liable therefor.

"3. That plaintiff is entitled to rescind said sale and transfer by him of his said stock in Richardson-Phenix Company to said *Dyke* and *Bromley,* and to judgment of rescission, providing for the payment and delivery to him of said fund of $7,009.07, now held by National Exchange Bank, invested in government securities, and in lieu of said stock, as above found, with the interest received by said National Exchange Bank thereon.

"4. That said plaintiff is entitled to recover from said defendant *Harriet Peterson,* as administratrix of the estate of J. William Peterson, deceased, and said *George M. Dyke* and *Charles H. Bromley* the sum of $475.68, being the difference between the amount actually paid by S. F. Bowser & Company, Inc., for plaintiff's stock, viz. $7,484.75, and the amount of said fund held by National Exchange Bank, as aforesaid, viz. $7,009.07, with interest thereon from January 16, 1922.

"5. That said plaintiff is entitled to recover his costs and disbursements of this action, to be taxed as provided by statute.

"Let judgment be entered accordingly."

From the judgment the defendants appeal, and make the following assignments of error: The court erred in finding that defendants Peterson, *Bromley,* and *Dyke* conspired or colluded in any way for the purpose of inducing the plaintiff to sell his stock; that there was any false or fraudulent representations made by the defendants Peterson, *Bromley,* and *Dyke* or any of them; that there was any concealment of fact from the plaintiff upon the part of Peterson, *Bromley,* and *Dyke* as a result of which the plaintiff was induced to sell his stock; that there was any duty upon the part of *Bromley* or *Dyke* to discover any fact for the benefit of the plaintiff or to advise of any facts within their knowledge; that the plaintiff relied upon any information furnished him by Peterson, *Bromley,* or *Dyke,* and that, so relying, was

induced to name $15 per share as the sale price of his stock; that there was any confidential relation between defendant Peterson and the plaintiff; that a tentative agreement for the purchase of the Richardson-Phenix stock was made between Peterson and Bowser & Company on September· 22 or 23, 1921, or at any time prior to the writing by Peterson of the letter of September 26, 1921, or at any time prior to October 11, 1921; that the plaintiff's case was proven; and in making the conclusions of law that it did, and in ordering judgment for the plaintiff; and the court erred in not ordering judgment for a dismissal of the action upon the merits with costs.

For the appellants there was·a brief by *Olwell & Brady* and *George A. Gessner,* all of Milwaukee, and oral argument by *Lawrence A. Olwell.*

For the respondent there was a brief by *N. L. Baker & W. J. Zimmers,* both of Milwaukee, and oral argument by *Mr. Baker.*

The following opinion was filed December 9, 1924:

CROWNHART, J.   As appears by the evidence on the trial of this case in the court below, plaintiff at all times mentioned was a lawyer of considerable business experience with corporate affairs, and understood in a general way how to interpret financial statements of corporations.

Sometime prior to 1912 plaintiff had secured stock in the Richardson-Phenix Company, and in June of that year became a director of the company, representing the Richardson interests.   In January, 1914, he left the board of directors of the company, and after that time knew but little about the business and general condition of the company. He received on his stock for the nine years prior to October, 1921, only two or three six per cent. dividends.  .When these dividends were paid a financial statement accompanied them.

While the plaintiff was a director of the company he had a verbal altercation with the defendant Peterson over what

plaintiff considered mistreatment of Mr. Richardson by the defendant Peterson. Plaintiff thought that Peterson harbored ill feeling toward him thereafter.

Peterson was an influential personage in the company during all the time of plaintiff's connection therewith, and along about 1918 had secured a majority interest in the stock of the company. At the time of the consolidation hereinafter mentioned Peterson was the president and treasurer of the Richardson-Phenix Company and was in active management of the company.

This was the situation on September 26, 1921, when defendant *Dyke* called upon plaintiff at plaintiff's office in Milwaukee and sought to purchase plaintiff's stock in the corporation for himself and the defendant *Bromley*.

For a couple of years prior to this time *Dyke* had occupied a responsible position with the Richardson-Phenix Company as its auditor. *Bromley* also occupied a responsible position with the company in connection with its sales department for about the same length of time. Both *Dyke* and *Bromley*, upon entering the service of the company, had suggested to Peterson that they desired some stock in the company, and Peterson had agreed that if their services proved satisfactory he would secure stock for them.

When *Dyke* applied to plaintiff to purchase plaintiff's stock plaintiff requested from him a financial statement of the condition of the company. *Dyke* replied that he was not an officer of the company and suggested that the plaintiff apply to Peterson for the information desired. Thereupon plaintiff, in the presence of *Dyke,* dictated to his stenographer the letter following:

"Richardson-Phenix Co.,                    September 26, 1921.
        "118 Reservoir Ave.,
                "Milwaukee, Wis.
                        "Attention Mr. Peterson.
"My dear Mr. Peterson:
    "*Mr. Dyke* suggests buying my stock in his own and others' interest.

"I am willing to sell at a fair price. I wish to know just what I am selling. For this reason I asked him for the most recent trial balance or other record of the accounts which would show the corporation's present financial condition.

"*Mr. Dyke* preferred to have this request passed on to you, so here it is.

"I regret very much to learn from him that Mr. Strothman is in such bad health, and am glad to know that you are in your usual superlative vigor. If the company has as large an undivided surplus of assets as you always seem to have of energy, it will be no less than you and your excellent and aggressive management has well earned.

"Seriously, it has been my thought for several years that my holdings would better be in the hands of some person active in your organization, and because of this I should be glad to make the suggested turn-over at what is a fair price under all the conditions.

"Yours sincerely,
"ROBERT N. McMYNN."

This letter was received in the mail by Peterson in due course. In the meantime *Dyke* had reported to Peterson the result of his negotiations with the plaintiff for the purchase of his stock, and upon receipt of plaintiff's letter, *Dyke,* under the direction of Peterson, prepared a statement purporting to represent the true financial condition of the corporation as of August 31, 1921. This statement was turned over to Peterson and by him forwarded by mail to plaintiff, together with this letter:

"*Mr. Robert N. McMynn,*                September 27, 1921.
        "534 Wells Building,
                "Milwaukee, Wis.
"My dear *Mr. McMynn:*

"Replying to your request of the 26th inst., I am pleased to inclose herewith our financial statement as of August 31st.

"At the time Mr. Strothman purchased Mr. Burroughs' stock, Mr. Burroughs told me you would like to sell yours and I have kept the matter in mind, but no stock has changed hands since.

"Some time ago *Mr. Dyke* and one of our good men, *Mr. Bromley,* expressed a desire to purchase a small block of stock and I suggested that they see you. I would like to have both of them interested with us, as practically all of our capital stock is now held by those active in the management of the business, which is advantageous, because we all draw sufficient salaries to take care of ourselves very nicely, and we are therefore able to leave the profits in the business to be used in building it up.

"I don't feel as though I ought to suggest what I would consider a fair price for you to ask for your stock, but as a matter of information, Mr. Strothman paid Mr. Burroughs $15 per share, at which time business was good and money was easy, whereas now conditions are just the reverse. Just now and for several months past we have been operating at a loss, but I am very hopeful for the future, because we have a sound business, which is bound to grow under normal conditions.

"I thank you for the kindly expressions contained in your letter, and while way back in the beginning we agreed to disagree, I have always felt that if this had not occurred we would have made a great team, and I shall continue to have the highest regard for you.

"Sincerely yours.

"J. WM. PETERSON,

"President and Treasurer."

Prior to the negotiations for the purchase of plaintiff's stock defendant Peterson had been in communication with the vice-president of S. F. Bowser & Company, a corporation, of Fort Wayne, Indiana, with reference to a consolidation or merger of the Richardson-Phenix Company with S. F. Bowser & Company. Some suggestions of this had been made a year or more prior to this time, and they were renewed on August 19, 1921. On September 22d or 23d a tentative oral agreement was entered into between Bowser & Company and Peterson looking to such combination. Between October 4th and 11th the attorneys of the respective

parties were in correspondence in the drafting of a written agreement to fix the terms of the merger between the two companies, and such agreement was put in writing and executed by the parties on October 11, 1921.. This agreement followed very closely the tentative agreement of September 22d or 23d. By the terms of the agreement Peterson was to deliver to Bowser & Company all the stock of the Richardson-Phenix Company on or prior to January 5th following, and to immediately deliver in escrow to the National Exchange Bank of Milwaukee a majority of the stock. The terms of the agreement were afterwards carried out and the stock of the Richardson-Phenix Company was taken over by Bowser & Company on a cash basis for $26.75 per share.

During the negotiations between Peterson and Bowser & Company on September 22d or 23d Peterson had *Dyke* prepare a financial statement, as of August 31, 1921, of the Richardson-Phenix Company, which was furnished to Bowser & Company for the purpose of determining the value of the stock which was to be purchased by Bowser & Company. This statement so furnished was found to be a substantially true and correct statement of the financial affairs of the company by the auditors who made an investigation of the Richardson-Phenix Company for Bowser & Company. The statement showed the book value of the stock to be $27.30 per share, which value was finally compromised between the parties and fixed at $26.75.

The stock of the Richardson-Phenix Company amounted to $200,000, divided into 20,000 shares of the par value of $10 each. The plaintiff owned 637 shares. Very shortly after the receipt by the plaintiff of the letter from Peterson inclosing the financial statement of the Richardson-Phenix Company, plaintiff left Milwaukee for the East and did not return until October 13th. Immediately upon his return he was called up by *Dyke* over the telephone and asked for

his answer as to sale of the stock.    To this inquiry the plaintiff replied by letter to Peterson and carbon copy to *Dyke,* which reads as follows:

"J. Wm. Peterson, Pres. and Treas.,    October 13, 1921.
    "The Richardson-Phenix Co.,
            "Milwaukee, Wis.
"My dear Mr. Peterson:
    "I left for New York on a business trip the day after I received your letter of September 27th and have just returned.

    "I have looked over the financial statement of August 31st which you were kind enough to send me and I congratulate you upon the solid and prosperous condition of the corporation.

    "If I had received $15 per share at the time Mr. Burroughs sold to Mr. Strothman, and invested what I got, I figure that the increase by interest would more than cover the difference in business conditions between that time and this.    Also, if I were yourself or any other salaried stockholder, I would not think of letting go such an interest in so sound a business at anything like that price.

    "I note that you would like to have both *Mr. Dyke* and *Mr. Bromley* as stockholders with you, and under these conditions I will sell whatever stock I have at $15 per share cash, and if it is any accommodation to the young men or to yourself, I will keep this offer open until November 1st.

    "I certainly appreciate your pleasant reference to myself, and as you know from my last letter I reciprocate your feelings.

    "I am sending a carbon copy of this letter to *Mr. Dyke.*
            "Yours sincerely,
                    "Robert N. McMynn."

Notwithstanding that plaintiff's offer to sell was open until November 1st, the parties made haste to close the deal. Immediately upon receipt of plaintiff's letter *Dyke* and *Bromley* took the matter up with Peterson, and the three of them went to the National Exchange Bank and arranged

for the bank to loan to *Dyke* the amount required to purchase half of plaintiff's stock, and to *Bromley* a similar amount to purchase the other half of the stock. Under the agreement with the bank the stock so purchased was to be put up as collateral security for the money loaned by the bank. *Dyke* and *Bromley* then forthwith repaired to the office of the plaintiff and notified plaintiff that they were prepared to take this stock at the price fixed in the letter to Peterson. Plaintiff thereupon turned over to *Dyke* and *Bromley* the stock and received from each one half of the purchase price by checks. Thereafter *Dyke* and *Bromley* had the stock transferred on the books of the company in their respective names and turned the same over to the bank as agreed, indorsing the certificates over to S. F. Bowser & Company with the understanding that the stock was to be delivered by the bank to S. F. Bowser & Company under the agreement of sale between Peterson and Bowser & Company, and the bank was to repay itself out of the purchase price.

This is the picture in rough outline of the case as presented to the trial court. However, many details were supplied by the evidence.

The appellants here take issue with the findings of fact, and this leads us to briefly analyze the evidence in support of the same. It should be borne in mind that Peterson had a twofold interest in securing plaintiff's stock for defendants *Dyke* and *Bromley*. First, he had promised each of said defendants that he would procure them some stock in case their services were satisfactory, and he was desirous of complying with his promise. Second, at the time he sent *Dyke* to the plaintiff to secure the stock Peterson knew that the merger of the Richardson-Phenix Company and Bowser & Company would most likely go through, and that under the terms of his agreement he would be required to deliver

all the stock over to Bowser & Company. The stock was all closely held, and all, with the exception of plaintiff's stock, was in friendly hands. Peterson was therefore anxious to have this stock also owned by friendly interests. Turning to plaintiff's letter to Peterson, it will be noted that plaintiff said at the very beginning that "I am willing to sell at a fair price. I wish to know just what I am selling. For this reason I asked him [Dyke] for the most recent trial balance or other record of the accounts which would show the corporation's present financial condition." He closed his letter with this statement: "I should be glad to make the suggested turn-over at what is a fair price under all the conditions." There can be only one interpretation to these paragraphs in the letter, and that interpretation was made by Peterson and clearly appears from his response to the letter. The plaintiff desired to know all the facts which would be helpful to him in fixing a fair price on the stock for the purposes of sale. We now turn to Peterson's reply. The first paragraph says: "Replying to your request of the 26th inst., I am pleased to inclose herewith our financial statement as of August 31st." This statement was untrue. The statement inclosed to plaintiff was not a true statement of the financial condition of the corporation as of August 31st. On the contrary, it was doctored for the purpose. Peterson had, only two or three days prior to this time, made a substantially true statement of the financial affairs of the corporation as of August 31st to Bowser & Company. This statement naturally would be fairly accurate, as it was to be subjected to the scrutiny of Bowser & Company's auditors. Instead of furnishing the plaintiff with a copy of that statement, the plaintiff was furnished with a statement which showed the condition of the company in a very much less favorable light than the statement made to Bowser & Company. For the purpose of showing the difference in statements, we have combined the two statements into one with

the figures in juxtaposition (see below). It will be seen at a glance that in the statement furnished the plaintiff the figures were manipulated with design.

THE RICHARDSON-PHENIX CO., MILWAUKEE, WIS.

*Financial Statement—August 31, 1921.*

ASSETS.

| | Statement Submitted to Bowser & Co. | | Statement Submitted to Plaint- iff. | |
|---|---|---|---|---|
| *Current Assets.* | | | | |
| Cash ........................... | $12,558 | 83 | $12,558 | 83 |
| Accounts receivable ............... | 46,515 | 37 | 46,515 | 37 |
| Notes receivable ................... | 10,905 | 00 | 62,500 | 00 |
| Prepaid purchases ................. | 470 | 64 | 470 | 64 |
| Unexpired insurance premiums...... | 3,138 | 92 | 3,138 | 92 |
| Prepaid items ..................... | 1,265 | 69 | 1,265 | 69 |
| | $74,854 | 45 | $126,449 | 45 |
| *Working Assets.* | | | | |
| Raw materials and supplies......... | $27,915 | 32 | $27,915 | 32 |
| Finished stock ..................... | 133,380 | 73 | 81,380 | 73 |
| Work in process.................... | 40,630 | 96 | 32,630 | 96 |
| Consigned stock and samples........ | 4,719 | 89 | 4,719 | 89 |
| Total working assets............ | $206,646 | 90 | $146,646 | 90 |
| Total current and working assets................... | $281,501 | 35 | | |
| *Fixed Assets.* | | | | |
| Land ........................... | $22,500 | 00 | $22,500 | 00 |
| Buildings ......................... | 77,965 | 34 | 60,729 | 12 |
| Machinery and equipment........... | 263,492 | 76 | 263,492 | 76 |
| Total fixed assets............... | $363,958 | 10 | $346,721 | 88 |
| *Intangible Assets.* | | | | |
| Good will ........................ | $63,000 | 00 | $63,000 | 00 |
| Patents ;......................... | 3,294 | 74 | 3,294 | 74 |
| Deferred expense ................. | 2,108 | 95 | 2,108 | 95 |
| Total intangible assets.......... | $68,403 | 69 | $68,403 | 69 |
| Total assets................ | $713,863 | 14 | $688,221 | 92 |

McMynn v. Peterson, 186 Wis. 442.

### LIABILITIES.

#### *Current Liabilities.*

| | | |
|---|---:|---:|
| Accounts payable ................... | $7,042 02 | $7,042 02 |
| Commissions earned (not due)....... | 4,782 65 | 4,782 65 |
| Accrued wages .................... | 777 86 | 777 86 |
| Notes payable ..................... | None | 60,000 00 |
| Government claim for back income and excess profits tax...... | None | 42,125 21 |
| Total current liabilities......... | $12,602 53 | $114,727 74 |

#### *Reserves.*

| | | |
|---|---:|---:|
| Accrued taxes ..................... | $5,930 00 | $5,930 00 |
| Reserve for depreciation........... | 100,814 46 | 100,814 46 |
| Reserve for income and excess profits taxes ........................ | 43,000 00 | None |
| Reserve for miscellaneous.......... | 5,524 69 | 5,524 69 |
| Total reserves ................. | $155,269 15 | $112,269 15 |

#### *Capital Stock.*

| | | |
|---|---:|---:|
| Common—Authorized .............. | $200,000 00 | $200,000 00 |
| Common—In treasury ............. | | |
| Common—Issued ................. | 200,000 00 | 200,000 00 |
| Surplus .......................... | 345,991 46 | 261,225 03 |
| Total liabilities ............... | $713,863 14 | $688,221 92 |

In the statement to Bowser & Company, under "Current Assets," notes receivable are given as $10,905, while in the statement to the plaintiff, notes receivable are given as $62,500, but under "Liabilities," notes payable are given as $60,000 in the *McMynn* statement, and nothing in Bowser & Company's statement; finished stock, in the statement to Bowser & Company, is given at $133,380.73, while in the statement to plaintiff it is reduced to $81,380.73; work in process in the Bowser statement is $40,630.96, while in the statement to plaintiff it is $32,630.96; total current and working assets in the Bowser statement is given as $281,501.35, and only $146,646.90 in the statement to plaintiff; buildings, under "Fixed Assets," is given in the Bowser statement as $77,965.34, and this sum is reduced in the statement to plaintiff to $60,729.12, with nothing in the statement to show what became of the difference. True,

there is testimony that a building put up for war-time operation was charged off as obsolescent. But why not charged off on the Bowser statement of the same day? It would seem that an effort was made to reduce the surplus in the *McMynn* statement. The surplus is given in the Bowser statement at $345,991.46, while in the statement to plaintiff it is given at $261,225.03. To the untrained mind, the surplus would be one of the great factors in determining the value of the stock. It will be seen that the surplus in the statement to plaintiff is decreased by over forty per cent. of the capitalization from the statement to Bowser & Company. Enough is shown on the mere face of these statements to indicate that the statement to plaintiff was a false statement, and made for the purpose of indicating less than the true value of the stock.

In the second paragraph of Mr. Peterson's letter he said:

"At the time Mr. Strothman purchased Mr. Burroughs' stock, Mr. Burroughs told me you would like to sell yours and I have kept the matter in mind, but no stock has changed hands since."

The first part of this statement may be true or may not be true. *Mr. Dyke* says that he told Peterson that the plaintiff had inquired of him about the purchase of Burroughs' stock and the price of the same, and this being so, it is quite evident that Peterson was reminded to cleverly introduce the subject in this way. But the statement "no stock has changed hands since" was a false statement and known to be false at the time it was made. Peterson, himself, but a short time before had purchased the stock ·of Swanberg.

In the next paragraph Peterson brings to the front a matter that had been pretty fully impressed upon the mind of the plaintiff in the years gone by, and that was that practically all the capital stock was held by men active in the business who drew "sufficient salaries to take ·care of our-

selves very nicely," and who were, "therefore, able to leave the profits in the business to be used in building it up." In other words, the plaintiff was served with notice then and there that he might not expect any more dividends if he held his stock.

Peterson then expressed in his letter that he thought it was too delicate an affair for him to suggest a price for plaintiff to fix on his stock, but proceeded to lay the facts, as he claimed, before the plaintiff, which facts were calculated to impress upon the plaintiff that the stock was worth less than $15 per share. He said:

". . . Mr. Strothman paid Mr. Burroughs $15 per share, at which time business was good and money was easy, whereas now conditions are just the reverse. Just now and for several months past we have been operating at a loss, but I am very hopeful for the future, because we have a sound business, which is bound to grow under normal conditions."

As thus painted the conditions of the company were ominous. It was losing money and had been losing money for several months,—how much was not stated. It may be suggested here that in order to make the statement of Peterson appear to be truthful it was necessary to change the financial statement that was rendered to Bowser & Company, and it was thus so changed. As a matter of fact the company was not losing money. The statement was false. For the year 1921 the company made profits that would allow it to pay more than ten per cent. on its capital stock, and even for the first eight months covered by the statement the profits exceeded ten per cent. The profits for 1921 were juggled by deducting therefrom a claim made by the United States government for taxes prior to 1921, amounting to more than $22,000, which were a charge against the business prior to 1921 and not a charge against the business of 1921.

*Dyke* knew that negotiations for the merger of the two companies were going on before he solicited the pur-

chase of plaintiff's stock, but both he and *Bromley* professed not to know anything about the terms of the proposed merger. However, we think the trial court was permitted to draw the contrary inference. The tell-tale finger-prints show up plainly in the conceded facts. Neither *Dyke* nor *Bromley* appears to have had any funds with which to purchase plaintiff's stock; with Peterson's assistance they borrowed from the bank the full amount of the purchase price; the stock was assigned to Bowser & Company and deposited with the bank as collateral; the notes were made payable the same day the deal was to be finally closed between Peterson and Bowser & Company; the bank was to deliver the stock to Bowser & Company and pay itself for the loans out of the sale price to Bowser & Company. These facts presuppose that *Dyke* and *Bromley* were familiar with the deal between Peterson and Bowser & Company. No other inference can be logically drawn. The claim that they and Peterson were interested in their having a working interest in the Richardson-Phenix Company is entirely negatived by the facts. The court could draw no other conclusion but that such representations were false and made with the intent to deceive the plaintiff.

Plaintiff testified that he was induced to sell at the price he did because of the false representations made to him. The court so found. The truth of this is shown not only in plaintiff's testimony but also in the letters which passed between the plaintiff and Peterson and the statements he concededly made to *Dyke* and *Bromley* at the time of the sale. The fact that Burroughs had sold stock for $15 per share when business was good and profitable, and that now the business was poor and losing money, made a strong impression on the mind of plaintiff. He even deemed it necessary to make an argument as to why he should receive as much as Burroughs,—because he had had the stock longer without dividends. The false statement of Peterson that he wished the stock to be held by parties directly asso-

ciated in the business who, by reason of adequate salaries, could leave the profits in the business, was calculated to impress upon the mind of the plaintiff that the prospects of future dividends were even less probable than in the past. When Peterson made these representations he probably knew that the stock, when secured, was to be assigned to Bowser & Company and not held by *Dyke* and *Bromley*. The object of Peterson in making these statements was plainly to get *McMynn's* stock into his control so as to insure Peterson's ability to carry out his agreement with Bowser & Company to deliver to that company all the stock of the Richardson-Phenix Company. That was an impelling motive. On the delivery of all the stock might depend the ultimate success of the deal.

Thus far we have discussed the active fraud of the defendants. They were equally guilty of concealment of facts which Peterson was required to divulge to plaintiff. Plaintiff had asked for facts upon which he could base a fair market value of his stock. The book value had some relation to the market value, but the ability and disposition to pay dividends was a much greater element going to increase market value. But over and beyond all else was the factor of value definitely fixed at the time *McMynn's* stock was purchased.

This court held in *Timme v. Kopmeier,* 162 Wis. 571, 156 N. W. 961, that the

"Directors of a corporation occupy a position of trust and confidence and are considered in the law as standing in a fiduciary relation toward the stockholders and as trustees for them. The directors of a corporation are not permitted to use their position of trust and confidence to further their private interests, nor to become parties to contracts concerning corporate affairs intrusted to their management which conflict with a free and impartial discharge of their duties toward the stockholders."

This rule was commented upon in the case of *Conger v.*

*Wallis,* 181 Wis. 378, 194 N. W. 340. The appellant contends that the rule was modified or held not to apply to a case of sale of stock by a shareholder to an officer of the corporation. A careful reading of the opinion of the court clearly shows no intention of modifying the rule of the *Timme-Kopmeier Case.* The court held in effect that that case did not apply to the *Conger-Wallis Case,* for the reason that the officer of the corporation—Wallis—did not breach his trust and the plaintiff Conger was not deceived by any misrepresentations of Wallis. In that case the trial court found against the plaintiff as to fraud and adjudged no cause of action for the same reason, and its judgment was affirmed by this court. As applied to the facts in that case, we reaffirm the decision in *Timme v. Kopmeier, supra.*

In the instant case the trial court finds a breach of duty on the part of the defendant, designedly intended to mislead the plaintiff, and which in fact did mislead him into making an improvident sale of his stock, resulting in large gains to defendants.

This court has expressed itself on several occasions on the relative duties of officers and stockholders in corporations. It has firmly maintained that officers of a corporation must treat stockholders with fidelity and good faith. *Jesse v. Four Wheel Drive Auto Co.* 177 Wis. 627, 189 N. W. 276.

This is the present tendency of courts of equity. Modern corporate methods demand open and honest dealings by the corporate officers toward the stockholders. In the *Four Wheel Drive Auto Co. Case* this tendency is shown, and also in *Goodwin v. von Cotzhausen,* 171 Wis. 351, 177 N. W. 618. Honesty and fair dealing between individuals is expected, and no less is to be demanded of those who occupy positions of agency and trust. Officers of corporations are elected to represent the shareholders and to carry on the business of the corporation in their interest. They

are not privileged to make false statements of corporate affairs or to suppress and conceal its business for the purpose of cheating the stockholders.

We recognize that the officers of a corporation represent all the stockholders and that situations may arise where full publicity of all the negotiations and business affairs of the corporation may be detrimental to the welfare of the stockholders considered as a whole. In such cases all that may be required of the officers is the exercise of honest judgment and honest disclosure in so far as disclosure of the business is made. But this is not such a case. Peterson held a majority of the stock; he was the president, treasurer, and general manager of the corporation. He held the secret that would determine the value of plaintiff's stock at nearly 100 per cent. in excess of the purchase price. Plaintiff had asked, as a basis upon which to fix a fair selling price of his stock, facts which would inform him "just what I am selling" and "a fair price under all the conditions." Peterson did not fairly or honestly respond.

The correct rule in such a case is laid down in *Strong v. Repide,* 213 U. S. 419, 29 Sup. Ct. 521, as stated in the syllabus:

"A director upon whose action the value of the shares depends cannot avail of his knowledge of what his own action will be to acquire shares from those whom he intentionally keeps in ignorance of his expected action and the resulting value of the shares. . . . Even though a director may not be under the obligation of a fiduciary nature to disclose to a shareholder his knowledge affecting the value of the shares, that duty may exist in special cases, and did exist upon the facts in this case. In this case the facts clearly indicate that a director of a corporation owning friar lands in the Philippine Islands, and who controlled the action of the corporation, had so concealed his exclusive knowledge of the impending sale to the government from a shareholder from whom he purchased, through an agent, shares in the corporation, that the concealment was in violation of

his duty as a director to disclose such knowledge and amounted to deceit sufficient to avoid the sale."

An analysis of the foregoing case shows that it is practically on all-fours in principle with the case before us. We are not called upon in this case to decide whether the rules applicable to trustees and *cestuis que trust* shall apply in the relations of officers of a corporation toward the shareholders. There is a difference of opinion in different jurisdictions. These cases are considered in *Dawson v. Nat. Life Ins. Co.* 176 Iowa, 362, 157 N. W. 929. No case holds that an officer of a corporation, under the particular facts of this case, may not be required to disclose facts within his knowledge to a stockholder whom he is seeking directly or indirectly to deprive of his stock.

It is strenuously contended that there is no evidence fixing liability on appellants *Dyke* and *Bromley*. We do not agree with this contention. The findings of the trial court cannot be disturbed unless they are contrary to the clear preponderance of the evidence. Proof of fraud is rarely shown by direct proof of intention, but on the contrary the intent to defraud is usually found as an inference from other facts. Here the inference of collusion between Peterson, *Dyke,* and *Bromley* is very persuasive. It is unnecessary to again state the evidence. In any view of the facts the court was warranted in concluding that the three defendants worked together for a common purpose in defrauding the plaintiff.

*By the Court.*—The judgment of the circuit court is affirmed.

A motion for a rehearing was denied, with $25 costs, on April 7, 1925.