THOMAS H. JUDSON, Jr., *ET AL.*, PLAINTIFFS-APPEL-
LANTS, v. PEOPLES BANK AND TRUST COMPANY,
ETC., DEFENDANT, AND BANKERS COMMERCIAL
CORPORATION AND JOHN C. EVANS, DEFENDANTS-
RESPONDENTS.

Argued May 27 and June 3, 1957—Decided September 23, 1957.

*Mr. Joseph A. Weisman* argued the cause for plaintiffs-appellants (*Messrs. Weisman & Freedman,* attorneys; *Mr. Joseph A. Weisman,* of counsel).

*Mr. Donald B. Kipp* argued the cause for defendants-respondents (*Messrs. Bilder, Bilder & Freeman,* attorneys for Bankers Commercial Corporation; *Messrs. Pilney, Hardin & Ward,* of counsel; *Mr. Walter J. Bilder, Mr. Donald B. Kipp* and *Mr. James C. Pitney,* on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. Plaintiffs charged they were induced by fraud to sell their shares of stock in Tuttle Bros., Inc. of Westfield, a New Jersey corporation, and sought to recover the difference between the price received and the actual value of the shares.

Plaintiffs accepted $2,500 in settlement from defendants, Peoples Bank and Trust Company of Westfield and the estate of Charles M. Smith, and consent judgments of dismissal were entered as to them. The remaining defendants, John C. Evans, the Sturdy Company, a New Jersey corporation (wholly owned by Evans), and Bankers Commercial Corporation, thereafter prevailed on a motion for summary judgment. This court reversed, *Judson v. Peoples Bank and Trust Company of Westfield,* 17 *N. J.* 67 (1954), and upon a plenary trial judgment was entered against these remaining defendants.

Plaintiffs appeal, asserting that the damages are inadequate and that the trial court erred in its application of the Joint Tortfeasors Contribution Law, *N. J. S.* 2A:53A–1 *et seq.* Bankers Commercial cross-appeals, questioning the finding of fraud and additionally the amount of damages. Neither Evans nor Sturdy appealed. We certified the matter on our motion prior to consideration by the Appellate Division.

## I.

The Tuttle company was engaged in the sale of lumber, mason materials, hardware and coal and did millwork. The business was started in 1897 and operated for some years as a partnership by William E. Tuttle, Jr. and his brother, Arthur D. Tuttle. The Tuttle corporation was formed sometime in the early 1920's. William died in 1923 and Arthur

in 1933. Their stock holdings ultimately devolved upon their nephews and nieces, the Judsons, who are parties plaintiff.

At the time of the events here involved, plaintiffs held 2,370 shares of common stock out of 2,578 shares outstanding. Evans, who came with the company as a bookkeeper in 1924, held 123 shares of common, virtually all of which he received by gift from Arthur D. Tuttle. Also outstanding were 883½ shares of 7% cumulative preferred stock with a par value of $100, held by a number of shareholders, none of whom is a party to this suit.

When Arthur died in January 1933 the company's position was insecure. It was experiencing the impact of the depression. Its real estate was encumbered by a mortgage originally in the sum of $240,000 held jointly by the Peoples Bank and the Westfield Trust Company. The Westfield Trust Company encountered difficulties, and the Federal Deposit Insurance Corporation took over its one-half interest.

Upon Arthur's death the Peoples Bank asked that Smith, its vice-president and director, be employed by the Tuttle company, and he was, receiving a salary of $100 per week for a number of years and thereafter compensation based upon the amount of service rendered. It is perfectly clear that Smith called the turn with respect to all corporate matters. The Judsons acceded to his requests, partly because of great confidence in him and partly because the bank's position as mortgagee and general creditor gave them no alternative.

Upon Smith's suggestion, Thomas H. Judson, Jr. resigned as president in favor of Evans in 1942, and in 1943 the Judsons assigned 1,832 shares of common, which represented control, to the Peoples Bank and F. D. I. C., as additional security. Smith continued his friendly relations with the Judsons, but upon the basis of relative ability selected Evans for the leading role in the corporate affairs. Evans regarded the Judsons as a drag upon the business and eventually succeeded in easing them out of active participation.

Thus, when the crucial events incepted in late 1944, Smith and Evans were in effective control. Evans took account of his personal situation and concluded he had no future with the company. The corporate picture had brightened somewhat, largely because of temporary war work consisting of the manufacture of airplane packages, but he felt the beneficiaries of his labors could be only the creditors or the Judsons. He confided in Smith that he planned to quit. Smith urged him to stay and seek to acquire the company. A plan emerged.

The first step appears to have been to remove Thomas Judson from the active scene. In November 1944 Evans demanded that he resign from the offices of vice-president and director, saying that the Peoples Bank so ordered, and Judson complied. Evans, who was without financial means, contacted a friend, one Rager, who mustered a syndicate with $100,000 of which $20,000 would be loaned to Evans, who would receive 20% of the common stock. Funds thus being available, Smith went to work to obtain the Judson stock, and Evans, with Smith's guidance, tackled the holders of the preferred.

In January or February 1945 Smith met with Thomas Judson and stated that the corporation was on the brink of insolvency; that the real estate was worth but a fraction of the book value; that the receivables had no value beyond the debts for which they were pledged; that most of the lumber on hand was suitable only for airplane packaging, and since the war work was at an end, the inventory was worthless; that his bank had determined to close in unless additional working capital were brought into the company; that he, Smith, had interested a wealthy friend in New York to buy the stock for a son and to inject the required working capital; that unless the Judsons seized this opportunity they would be wiped out. He asked Judson to transmit this information to his family. Ultimately the Judsons agreed to sell at the figure Smith suggested, to wit, $15 a share, and executed options to Rager on March 24, 1945.

Evans again reviewed his situation and concluded the

Rager deal was not promising, for under it he would hold a minority interest of 20%. He so informed Smith, who agreed. Evans then went to Bankers Commercial, which for years had financed receivables and inventory for the Tuttle Company. He laid his problem before Langhans, a vice-president, who proposed that Bankers Commercial lend the required funds under a plan by which it would purchase the common and preferred and resell to the Tuttle Company via a corporate shell, the Sturdy Company. Langhans pointed out that the Rager options had to be eliminated, and Evans blandly paid Rager $5,000 of the Tuttle Company's funds to have him step aside. Smith obtained new options running to himself upon a representation that the renewals were for the benefit of the same prospect, and then assigned the options to Bankers Commercial to carry out the plan just described.

That the representations made to the Judsons were flagrantly fraudulent cannot be disputed. With the connivance of Smith, Evans transmitted a false picture of imminent doom, and while representing that the structure would fall unless fresh working capital were obtained, he schemed in fact to eliminate their holdings with the funds of the company itself. The Judsons parted with their shares at the option price of $15, for a total of $35,550. The holders of preferred accepted $48,850 for shares having a par value of $88,350 and unpaid dividends of $84,003.18. One thorn remained. A holder of 25 shares of common was impervious to sundry pressures, and since his shares would swell in value if all but his and Evans' 123 shares were retired, the adamant shareholder came out with $1,500. Rager had obtained $5,000; Smith received a like sum; and Bankers Commercial a "fee" in the same amount in addition to interest on its advance. All of these payments were made out of corporate funds. .Not a penny came from Evans who, when the transactions closed, held the corporate equity.

Bankers Commercial challenges the sufficiency of the proof of fraud as to Evans and Smith. It first disputes the existence of a confidential relationship between Smith

and Thomas Judson. That Judson trusted Smith and valued his opinions is clear. Whether a confidential relationship in its technical sense existed between them is here of no moment. The fraud consisted of affirmative misrepresentations, and hence the nature of the relationship between the men is merely a circumstance bearing upon the issue of justifiable reliance upon the representations made.

Nor is there substance to the contention that the representations were solely matters of opinion. They included a statement that the bank planned to close in unless fresh working capital were injected, whereas the plan in fact contemplated a depletion of working capital. And with respect to the opinions expressed by Smith as to the value of the assets and the business prospects, they too will support a charge of fraud. Smith did not purport to be an armslength party to a purchase, but rather pretended to be a friend of the Judsons, bent upon advancing their interests. Although ordinarily expressions of opinions may not be relied upon, the rule is otherwise where the opinion is given by one who has succeeded in securing the confidence of the victim, or holds himself out as having special knowledge of the matter, or purports to be disinterested. 3 *Restatement, Torts* (1938), secs. 542, 543; *Prosser, Law of Torts* (2d ed. 1955), sec. 90, p. 561 *et seq.; cf. Plimpton v. Friedberg,* 110 *N. J. L.* 427 (*E. & A.* 1933).

Bankers Commercial further contends that the Judsons could not rely upon the misrepresentations because they had full information with respect to the corporate affairs as of the year-end statement of December 31, 1944, and could readily have obtained whatever data was desired. As will presently appear, the corporate balance sheet was not too helpful because of the problem of valuation and yield in a distress liquidation. And with respect to access to information, it may be noted that at least during the months in 1945 when the negotiations were under way, Evans made false penciled footings with respect to cash disbursements, resulting in a substantial understatement of the cash balance; and the inference is inescapable that Evans pursued that

course in anticipation of a possible inquiry by stockholders. At any rate, one who perpetrates a fraud may not urge that his victim should have been more circumspect or astute. *Peter W. Kero, Inc., v. Terminal Construction Corp.*, 6 *N. J.* 361, 369 (1951); *Schoharie County Cooperative Dairies, Inc., v. Eisenstein*, 22 *N. J. Super*. 503 (*App. Div.* 1952). The true question is whether there in fact was reliance. If reliance is found, as it is here, false representations which accomplish an intended fraud will suffice to support judicial relief.

■ Lastly, it urged that since only Thomas and William Judson testified to reliance, recovery must be confined to them. Ordinarily, direct evidence is furnished but reliance may be found by fair inference. 24 *Am. Jur., Fraud and Deceit*, sec. 288, *p.* 134; *cf. Flanigan v. McFeely*, 20 *N. J.* 414, 419 (1956). Here Smith urged Thomas to transmit the representations to the family, and he did. None of the Judsons was seeking to sell. The transaction was prompted by the bleak story which Smith intended to reach them. In these circumstances, the inference is warranted that the misrepresentations hit the mark.

This brings us to the more difficult question whether Bankers Commercial participated in the scheme. It says that from where it stood it knew only that Evans had a good bargain. Such knowledge alone would not sustain a claim of conspiratorial participation; this court so indicated upon the first appeal. *Judson v. Peoples Bank and Trust Company of Westfield, supra* (17 *N. J.*, at *page* 84).

■ There is no evidence that Bankers Commercial knew of the specific conversations between Smith and Judson. The record permits, and we think requires, findings that Bankers Commercial knew that Evans (1) was president and director and indeed the only stockholder active in management of the company; (2) sought to acquire the beneficial interest in the company by use of its funds; and (3) sought so to do without the knowledge of plaintiffs. The first finding is not debatable. With respect to the second finding, Conlon, a vice-president of Bankers Commercial, testified

on pretrial discovery that he understood that Evans represented to Langhans that Evans had $50,000 of his own funds to cover part of the cost. But the documentary proof, including a memorandum from Langhans to Conlon, showed plainly that Bankers Commercial knew that only corporate funds would be used; indeed, Bankers Commercial itself suggested that course and agreed to advance $54,000 on a chattel mortgage against inventory to supply part of the cash needed for the stock purchase as well as for working capital which otherwise would be depleted by the transactions. And with respect to the third finding, Bankers Commercial knew that the options to Rager were intended in part for Evans and that the renewal options in the name of Smith were solely for the individual benefit of Evans. We find it inescapable that this defendant knew that Evans was secreting from plaintiffs the fact that he was the purchaser and was using the corporate assets to eliminate their stock interests.

Hence the question is whether those facts charged Bankers Commercial with knowledge of a fraud upon plaintiffs, and this requires consideration of the nature of the duty Evans owed to the shareholders. Existing decisions in our State take a narrow and much criticized view (see 3 *Fletcher, Corporations* (1947), *sec.* 1167, *p.* 776 *et seq.*) with respect to the duty of disclosure of an officer and director who purchases shares from a stockholder. *Crowell v. Jackson,* 53 *N. J. L.* 656 (*E. & A.* 1891); *Connolly v. Shannon,* 105 *N. J. Eq.* 155 (*Ch.* 1929), affirmed 107 *N. J. Eq.* 180 (*E. & A.* 1930); *Gardner v. Baldi,* 24 *N. J. Super.* 228 (*Ch. Div.* 1952). But there is no doubt that, at least in their dealings with the corporation and its assets, officers and directors are *quasi*-trustees for the benefit of shareholders. *Connolly v. Shannon, supra; Hill Dredging Corp. v. Risley,* 18 *N. J.* 501, 530 (1955); 13 *Am. Jur., Corporations, sec.* 997, *p.* 948.

Here corporate assets were used for the personal advantage of the president and director without the knowledge of the complaining shareholders and at their expense. This

Bankers Commercial knew and yet furnished the funds; in fact, it really authored the plan. A person is liable with another if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself * * *." 4 *Restatement, Torts* (1939), *sec.* 876(*b*). For its participation, Bankers Commercial must respond. *Judson v. Peoples Bank and Trust Co. of Westfield, supra* (17 *N. J.,* at *page* 83).

## II.

The trial court found the common stock was worth $29 per share. Plaintiff's assail the figure as too low, and Bankers Commercial attacks it as excessive.

The book value of common as of July 27, 1945 was about $150 per share. The proofs involved a reconstruction of the balance sheet as of July 27, 1945, the date of consummation of the transaction, valuations of underlying assets, and some testimony adduced by defendants from a man who buys and sells corporations. The spread in the testimony was quite dramatic.

In addition, there was evidence that upon the death of Arthur D. Tuttle, his shares were reported for federal estate tax purposes at $18.34 per share as of January 8, 1933 (later adjusted at $26.60 per share), and that upon the death of Thomas H. Judson, Sr. his shares were reported upon a New York estate tax return at $25 per share as of February 8, 1938. It may be said that except for the flurry of war activity referred to above, the corporate experience continued to be generally poor. The 1944 year-end statement showed an accumulated operating deficit of $363,184.73, and even this figure was challenged by an accountant for defendants who was of the view that the company should have written off a substantial amount for bad debts for the period 1936 to 1945. Hence the estate tax valuations were somewhat more meaningful than the time hiatus would ordinarily suggest. On the other hand, the books recorded a sale of 15 shares of common for $25,000

in May 1947 (at that time 148 shares of common were out-
standing) and a further sale of 15 shares for $25,000 in
March 1948. But no testimony was adduced as to the
circumstances of those sales, and in the light of all of the
other evidence the naked fact of sales at that figure cannot
be accorded too much weight. The company went into
bankruptcy in 1949. So far as the record before us goes,
the cause of the corporate failure is undisclosed.

Various considerations pertinent to the valuation of shares
of a close corporation were thus before the trial court. See
*Bassett v. Neeld*, 23 *N. J.* 551 (1957). After considering
all of them the court, in substance, reached its result by
revising the balance sheet and adding $2 a share for "going
value."

The attack by both sides is addressed primarily to the
trial court's treatment of individual items. Plaintiffs com-
plain of the value placed upon the real estate and defendant
challenges the finding as to the inventory. In considering
these contentions it must be borne in mind that these items
are but elements in the overall determination of the value
of the shares of a company, which, although a going concern,
yet faced the possibility of forced liquidation in the light
of a long history of poor performance.

The real property (except for some minor additions) was
donated to the company by the original partners. The cost
to the partnership as of June 30, 1929 was $181,338. It
was taken in by the corporation at a figure $300,000 in
excess of that cost. Subsequently the Internal Revenue
Department disallowed that differential for the purpose of
excess profits taxation, a circumstance which is not helpful
in ascertaining its value.

There is no point in detailing the conflicting
testimony. The land was a large parcel with sundry struc-
tures, some ancient and some overbuilt. Undoubtedly, one
starting from scratch would not imitate the improvements
or the layout. From the standpoint of a going concern
engaged in the several activities of the Tuttle company, the
real estate could have value above what would be realized

upon its sale. The trial court accepted in the main the testimony of Van Horn, a realtor and appraiser, in reaching a land valuation of $55,000 and building valuation of $152,000, to which was added $14,000, the virtually conceded value of two dwellings which had been sold. The resulting figure was $221,000 as against the book value of $415,000. In reaching his estimate, Van Horn included a 25% factor for economic depreciation in addition to physical depreciation. The brunt of plaintiffs' attack upon Van Horn's testimony rests upon the fact that in March 1948, at the request of Evans, Van Horn valued the land at $69,464 and the structure at $277,577. Van Horn explained that the 1948 appraisal was made on an "owner-user" basis, "almost an insurance value," in which economic depreciation played no role, and added that both land value and construction costs rose between 1945 and 1948. There unquestionably is a difference in fact between the value of property of unusual features beneficially serving the needs of the user and the sum the property would yield on a sale to others for other uses. It is true, as plaintiffs urge, that since we are here concerned with the value of shares in a going concern, the price which the real estate would yield on a separate sale is not controlling; but in the light of the uncertain future of the company in July 1945, the selling value of the property in that eventuality could not be wholly ignored. It is a consideration which a purchaser of shares of stock would naturally take into account in deciding what to pay. It may be noted again that the trial court added $2 a share for "going value." We cannot say the trial court's finding is erroneous.

Bankers Commercial questions the court's acceptance of the inventory figure found by plaintiffs' accountant, Puder. In the main, Bankers Commercial is critical of the use of a yellow sheet which was found with the books and records of the Tuttle company in the possession of a custodian in the bankruptcy proceedings, and which purported to state the actual inventory, as against the estimated, as of July 30, 1945. The difference was $28,000.

Bankers Commercial contends the exhibit was not shown to be a part of the records of the company. The exhibit was identified by Thomas Judson as being in the handwriting of Evans. It seems to us to have been sufficiently shown to have been made in the regular course of business. But more importantly, the inventory figure did not rest solely upon this paper. Puder so testified, pointing out that he referred as well to purchases and sales in conjunction with the year-end figures of 1944 and 1945. We are satisfied the trial court's finding is warranted by the evidence. We repeat that too much stress may not be placed upon a single item. The value of the shares ultimately represented an interplay of many considerations, including the earnings potential of the aggregated assets. The true inquiry is whether we should disturb the trial court's total finding, and thus reviewing the entire record we are not persuaded by either side that we should, except in a small particular referred to hereinafter.

Plaintiffs say the trial court should not have deducted the par value ($88,350) of the preferred shares and the accumulated dividends ($80,398.50) in reaching the value of common, but rather should have used the figure of $48,850 at which the company in fact acquired the preferred.

We pass quickly the contention that the accumulated dividends were not "debts" because not so recorded on the books. We are not concerned with whether good accounting requires the unpaid accumulations to be thus recorded. The preferred right to receive the agreed dividends upon liquidation requires that the arrearages be deducted from the total capital account in arriving at common's interest in it. 2 *Bonbright, Valuation of Property* (1937), p. 1058; cf. *Wessel v. Guantanamo Sugar Co.,* 134 *N. J. Eq.* 271 (*Ch.* 1944), affirmed 135 *N. J. Eq.* 506 (*E. & A.* 1944); *Lonsdale Securities Corp. v. International Mercantile Marine Co.,* 101 *N. J. Eq.* 554 (*Ch.* 1927).

It is not clear upon what theory plaintiffs seek the advantage realized by Evans as a common stockholder when the preferred shares were acquired by the company at the

reduced figure. Plaintiffs say the acquisition of common and preferred was part of a single plan. This is true, but it no more entitles plaintiffs to recover the differential than it would entitle the preferred shareholders to claim the loss sustained by plaintiffs. It is true also, as plaintiffs say, that had they rescinded their sales (the bankruptcy obviously dictated another course), the advantage would have been theirs, but this would be so only because their shares would have appreciated by reason of the corporate gain on the transactions, and then, of course, only on the questionable assumption that the dealings with the preferred did not result in an off-setting liability to them for fraud, a matter upon which we need not here express any view. And if it could be said upon some approach that Evans interfered with an opportunity of plaintiffs to purchase the preferred, the answer is that nothing suggests that the preferred shareholders would have been willing to relinquish any part of the full value of their holdings if the transactions with them had been handled upon any basis consonant with morality. The only possible question we detect is whether the prices at which the preferred shares were purchased should be accepted as fixing their actual value in calculating the worth of common, and as to this it is enough to say that the representations by which the preferred were purchased (at prices ranging from $36 to $105) destroy the evidential value of those sales. In short, the loss was experienced by the preferred and not by plaintiffs.

Plaintiffs complain that the sums of $5,000 each received by Rager, Smith and Bankers Commercial were not added to the sum found to be the difference between the price received and the fair market value of the shares as of July 27, 1945. The payment to Bankers Commercial was made after the mentioned date, and apparently the same is true of the payment to Smith. Hence, the cash paid to them was reflected in the damages awarded; the payments were not at plaintiffs' expense. The payment to Rager, however, was made before July 27, 1945, and thus reduced the total cash taken into account in valuing the

stock. Accordingly, plaintiffs' proportionate interest in that sum should be added to arrive at a correct valuation as of the critical date.

## III.

The trial court found the tortfeasors to be: (1) Smith, (2) Peoples Bank, (3) Evans, (4) The Sturdy Company, and (5) Bankers Commercial. None of the parties question the finding as to the Peoples Bank. Plaintiffs having accepted $2,500 in settlement from the estate of Smith and the Peoples Bank, the trial court, pursuant to the opinion of this court on the first appeal, concluded that a sum equal to two full shares must be credited against the total damages. It found the Sturdy corporation to be an empty shell and the mere *"alter ego"* of Evans, and hence deemed those defendants to be a single unit. Upon a supplementary hearing, it found Evans to be insolvent. It was thereupon concluded that but three defendants figure in the calculation, to wit, Smith, the Peoples Bank, and Bankers Commercial, and since two had been relieved by settlement, Bankers Commercial was adjudged liable for one-third of the total damages. The judgment, so limited, ran as well against Evans and the Sturdy Company. Plaintiffs correctly say that upon the trial court's approach, if accepted, the judgment insofar as Evans (and Sturdy) are concerned should have been for one-half of the total damages, because Evans (and Sturdy) should not in any event profit by reason of his alleged insolvency. But we need not further explore this aspect of the judgment since for other reasons we hereinafter conclude that the insolvency of Evans should be disregarded even with respect to Bankers Commercial.

Plaintiffs ask us to reconsider the first *Judson* opinion and urge that the remaining defendants receive a credit only in the amount of the settlement. As noted in that opinion, our Legislature did not adopt the Uniform Contribution Among Tortfeasors Act, but rather borrowed from it and left gnawing problems for judicial solution. Plaintiffs say

that in concluding that the liability of the remaining defendants be reduced by the full *pro rata* shares of the tortfeasors relieved by settlement we read into our statute a result "akin" to provisions of the uniform law which the Legislature refused to accept. We cannot agree. The plain import of sections 4 and 5 of the uniform law, which do not appear in our statute, is that where a tortfeasor settles for less than his full share the other tortfeasors shall receive a credit for the sum paid in settlement and may pursue their right of contribution against the settling wrongdoer unless the settlement papers contain an agreement for a full *pro rata* credit upon the liability of the remaining wrongdoers. Hence, the conclusions reached on the first *Judson* appeal rested upon an approach distinctly different from that of the omitted sections of the uniform law.

 We grant that neither of the approaches thus far discussed is satisfactory. It is the policy of the law to encourage settlements and any statutory scheme replacing the inequitable common law approach to contribution ought not to be so fettering as to deter them. It is plain that both the mentioned approaches have precisely that effect. If a plaintiff must credit a full share, he is not apt to risk a small settlement which might otherwise be prudent. On the other hand, if a settling defendant remains amenable to an action for contribution, the peace he would buy might be but a delusive interlude.

The unwelcome impact of the uniform law accounts for the general failure to adopt it and persuaded the National Conference of Commissioners to withdraw its recommendation in 1955 and to propose a substitute measure. In doing so the Commissioners commented:

"The effect of Section 5 of the 1939 Act has been to discourage settlements in joint tort cases, by making it impossible for one tortfeasor alone to take a release and close the file. Plaintiff's attorneys are said to refuse to accept any release which contains the provision reducing the damages 'to the extent of the *pro rata* share of the released tortfeasor,' because they have no way of knowing what they are giving up. The '*pro rata*' share cannot be determined in advance of judgment against the other tortfeasors. In

many cases their chief reason for settling with one rather than another is that they hope to get more from the party with whom they do not settle. A provision for reduction in a fixed amount will not protect the settling tortfeasor from contribution. No defendant wants to settle when he remains open to contribution in an uncertain amount, to be determined on the basis of a judgment against another in a suit to which he will not be a party. Some reports go so far as to say that the 1939 Act has made independent settlements impossible. Many of the complaints come from plaintiff's attorneys, who say that they can no longer settle cases with one tortfeasor. Such reports have reached other states, and have been responsible for a considerable part of the opposition to the 1939 Act. The New York Law Revision Commission has introduced a number of bills for contribution acts, and this objection has been the chief factor in defeating them."

The substitute uniform law provides that a settlement shall discharge the settling tortfeasor from liability for contribution if the settlement is made "in good faith," the non-settling tortfeasor to receive credit for the amount actually paid in settlement. This approach seems to be a superior solution, but its origin must be legislative; we cannot possibly read it into our own statute without exercising a power that is not ours. In these circumstances we feel constrained to abide by the interpretation made on the first appeal, conceding that the consequences are unhappy but recognizing that the only possible alternative before us, to wit, the thesis of the uniform law of 1939, would hardly be an improvement.

On the first appeal this court divided upon the question whether the statute applied to intentional wrongdoers. The majority held that it did and plaintiffs ask that this view be reappraised. It may be noted that the substitute measure proposed by the National Conference of Commissioners would exclude such tortfeasors from the benefit of the law. A majority of the court, however, remain of the view that the conclusion on the first appeal constitutes a correct interpretation of our statute. Hence, if there ought to be a revision, recourse must be had to the Legislature.

The next question is whether Smith and the Peoples Bank were properly considered as separate units for the.

purpose of calculating the credit. Our statute provides that "A master and servant or principal and agent shall be considered a single tortfeasor." *N. J. S. 2A :53A*–1. Plaintiffs urge that Smith and the bank accordingly should be deemed to be one, and add that if they are not, then Langhans and Conlon, actors for Bankers Commercial, should likewise be separately counted even though not named as defendants.

The quoted statutory provision reflects the view that ordinarily a master and servant or principal and agent are a single economic entity and hence should be so considered in prorating liability. Perhaps, also, the legislative decision derived from the circumstance that in the usual case the liability of the master or principal is vicarious and hence they are entitled to indemnity from the offending servant or agent.

The finding with respect to the Peoples Bank postulates that Smith acted for it just as Langhans and Conlon acted for Bankers Commercial. But it seems to us that Smith's situation differs from that of Langhans and Conlon in that Smith acted also for his own gain. He personally acquired the sum of $5,000 and hence was correctly deemed to be a separate tortfeasor notwithstanding that his conduct served also to implicate his employer.

These basic considerations also sustain the trial court's treatment of the Sturdy Company. It was an empty shell utilized as a conduit by Evans. It had no independent interest. It was therefore properly identified with Evans as a single tortfeasor for present purposes.

The remaining question concerns the impact to be given to the insolvency of Evans. In the first opinion a reference was made to the possibility of insolvency, and it must be said that the trial court correctly detected the flavor of that comment. However, this court's expression there was made upon a mere hypothesis without the opportunity for full appreciation of the impact of that view which concrete facts now permit.

Defendants stress that under the equitable doctrine of contribution, apportionment is made among the defendants who are subject to process and solvent. *Johnson v. Tennessee Oil, Gas and Mineral Development Co., 75 N. J. Eq.* 314 *(Ch.* 1909). The setting in which that rule applies differs from the one before us. The equitable rule as applied in *Johnson* did not concern the claimant. Rather it dealt solely with relief among the defendants. The thesis was that a defendant who paid more than his share should receive contribution from defendants on hand and able to pay, each of the defendants then to be remitted to the equal burden of pursuing the others. Here, however, the issue is whether there should be transferred to the injured claimants a loss consequent upon the insolvency of a tortfeasor.

We start with the proposition that contribution was not available at law, and for that matter was not available even in equity in the case of fraudulent wrongdoers. *Kanzler v. Smith,* 142 *N. J. Eq.* 609 *(Ch.* 1948) ; 3 *Scott on Trusts* (1956), *sec.* 258.3, *p.* 2025; *Restatement, Trusts* (1935), *sec.* 258 (2) ; *cf. Prosser, Torts (2d ed.* 1955), *sec.* 46, *p.* 249. The statute was intended to relieve the tortfeasors of an injustice as among themselves. It was not designed to prevent a full recovery by the victim unless he voluntarily invited a reduction by settling with a tortfeasor for less than a *pro rata* share. It would be inequitable and beyond the thesis of the statute to visit upon a plaintiff a further loss by reason of the insolvency of a tortfeasor where nothing suggests that at the time of settlement the claimant knew of the insolvency and meant to prejudice a remaining defendant. The risk of that loss should rightly remain with the offender. It may be added, although the result we reach does not hinge upon it, that insolvency does not necessarily portend uncollectibility, since the liability of Evans is not dischargeable in bankruptcy, 11 *U. S. C. A.,* § 35, and hence the question here is who should bear the weary burden of pressing a claim in such circumstances. We think the problem should be left with Bankers Commercial.

## Conclusion.

The judgment should be modified (1) by providing that Bankers Commercial, Evans and Sturdy, are jointly and severally liable for 50% of the total damages, and (2) by adding plaintiffs' proportionate interest in the $5,000 payment to Rager to the damages as of July 27, 1945, as found by the trial court. The matter is remanded with directions to modify the judgment in harmony with this opinion.

Heher, J. (dissenting in part). I concur in the conclusion of my colleagues that the representations made to the Judsons were "flagrantly fraudulent," "affirmative misrepresentations" justifiably inducing reliance, and that Bankers Commercial Corporation knowingly participated in the combination to cheat and defraud.

But, in the admeasurement of the damages, adherence is not given to the rule that the frauddoer is liable for all damages naturally and proximately ensuing from the wrong, which in equity may include the disgorging of all profits attributable to the fraud. *Smith v. Duffy,* 57 *N. J. L.* 679 (*E. & A.* 1895); *Driscoll v. Burlington-Bristol Bridge Co.,* 8 *N. J.* 433 (1952); *Zeliff v. Sabatino,* 15 *N. J.* 70 (1954); *Falk v. Hoffman,* 233 *N. Y.* 199, 135 *N. E.* 243 (*Ct. App.* 1924). *McMynn v. Richardson-Phenix Co.,* 186 *Wis.* 442, 201 *N. W.* 272 (*Sup. Ct.* 1924). Compare *Magee v. Holland,* 27 *N. J. L.* 86 (*Sup. Ct.* 1858); *Crater v. Binninger,* 33 *N. J. L.* 513 (*E. & A.* 1869). And all who act in concert are liable for the entire result. The payments to Rager, Smith and Bankers all came from the funds of the Tuttle corporation; and it is of no consequence in this view that they were made subsequent to the day set for the valuation of the corporate stock.

And, by the same token, only the actual cost of the preferred stock to the participants in the conspiracy should be considered in assessing the value of the common stock.

I am also persuaded that an undervaluation of the corporate real estate unduly impaired the value of the stock

in the determination embodied in the judgment under review. It suffices to say in this regard that defendants' witness, Van Horn, who fixed the value of the real estate at $190,000, had in 1948 appraised the same property at $350,000.

And, for the reasons given in the concurring opinion rendered on the earlier hearing of the cause, 17 *N. J.* 67, 94 (1954), the statutorily-given right of contribution does not comprehend this class of cases. Unlike the Uniform Tortfeasors Contribution Act, then recommended by the National Conference of Commissioners on Uniform State Laws, 9 *U. L. A.* 156, section 3 of our statute, *N. J. S.* 2A:53A–3, in express terms confines the operation of the principle to cases where "injury or damage" is suffered by any person as a result of the "wrongful act, neglect or default of joint tortfeasors," for which a money judgment is recovered. The word "tort" manifestly has a more extensive meaning than "wrongful act"; otherwise, the departure in terms would have no significance whatever. Indeed, as pointed out on the prior submission, there is a distinction of substance between these expressions that has pervaded the law of contribution from the very beginning; and this differentiation has since been given recognition by the National Conference of Commissioners in their 1955 recommendations, of which more hereafter.

"Wrongful act," as used in our statute, is characterized by its associates "neglect or default," the whole meaning the positive and the negative breaches of duty in nature the same * * * acts of commission and omissions and failures not intentional, willfully criminal, fraudulent or tainted with moral turpitude. The immemorial rule denying contribution between those who knowingly and willfully do grievous injury to person or property in the pursuit of a conspiratorial design is founded in sound public morality. There is no conceivable reason of policy why willful frauddoers and *particeps criminis* should have the benefit of the essentially equitable doctrine of contribution.

These principles were given due recognition by the National Conference of Commissioners in their submission of a sub-

stitute act in 1955, to "reconcile the serious variations which exist and, if generally adopted would eliminate the presently existing confusion" and the complete lack of uniformity, circumstances which had induced the Commissioners to withdraw the Model Act of 1939 "for further study and revision." New Jersey is there classified as one of six states "which declare the right to contribution and leave most questions to the courts." *Handbook of the National Conference of Commissioners on Uniform State Laws* (1955), *p. 216 et seq.*

Section 1(c) of the proposed substitute provides:

"There is no right of contribution in favor of any tortfeasor who has intentionally [wilfully or wantonly] caused or contributed to the injury or wrongful death."

And the Commissioners' comment on this sub-section thus:

"*Intentional, wilful and wanton.* \* \* \* The 1939 Act was silent on the matter. The policy here followed is that of the original rule as to contribution, that the court will not aid an intentional wrongdoer in a cause of action which is founded on his own wrong. In cases of concerted battery, for example, there appears to be little reason to shift any part of the liability to another.

Two valid reasons exist for extending the exclusion to wilful and wanton acts causing or contributing to the injury.

In the first place wilful and wanton acts seem naturally to belong in the same class with intentional wrongs and to imply moral turpitude on the part of the wrongdoer. The policy of the section as drafted adopts the law of those states which do not recognize classification of negligence into degrees. It is intended to convey the idea that there is a difference between negligence and wilful or wanton misconduct.

In the second place, by excluding wilful and wanton actors from the right to contribution, we eliminate most of the arguments urged for a rule allocating the shares of liability on the basis of relative degrees of fault.

In many states 'gross and wanton negligence' in guest statutes is construed to mean wilful and wanton conduct. This is the rule which should be applied in determining the right of contribution under this act.

Brackets have been placed around the words 'wilfully or wantonly' so that they may be omitted in those states where by definition of the terms they mean something less than they imply and where by including them the bar of the remedy would be too broad."

· Conspiratorial fraud of the class now before us was not within the design of the Model Act of 1939. The Commissioners themselves say the draft "was silent on the matter." Much less can it be said that this "flagrantly fraudulent" conduct was a "wrongful act, neglect or default" subject to contribution in the statutory sense. In his recent work on torts, Dean Prosser concludes that the rule denying contribution in favor of "negligent tortfeasors" is "in full retreat," and "in due course of time the pressure of opinion will compel its abolition," but "As to wilful wrongdoers, or those who are guilty of the most flagrant forms of misconduct, there is no indication of any desire or tendency to relax the original rule." *Prosser, Law of Torts* (2d ed. 1955), *section 46.* Apart from the stated considerations of policy underlying the rule that where the defendants act in concert, the act of one is the act of all, and each is liable for the entire loss, the denial of contribution in such circumstances makes for deterrence from conspiratorial fraud. *Thweatt's Adm'r v. Jones,* 1 *Rand., Va.,* 328 (*Va.* 1825); *Peck v. Ellis,* 2 *Johns. Ch., N. Y.,* 131 (*N. Y.* 1816). · See also *Prosser, "Joint Torts and Several Liability,"* 25 *Cal. L. Rev.* 413 (1937).

I would modify the judgment accordingly.

*For affirmance and modification*—Chief Justice WEINTRAUB, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—6.

*Opposed*—None.

HEHER, J., dissenting in part.