NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4237
_____

MICHAEL REIS, SR.; LAWRENCE J. KATZ, on their own behalf;
and as assignees of Weaver Nut Company, Inc.,
Appellants

v.

BARLEY, SNYDER, SENFT & COHEN, LLC
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 05-01651)
District Judge:  Honorable James Knoll Gardner
_____

Submitted Under Third Circuit LAR 34.1(a)
January 11, 2011
_____

Before: SCIRICA, BARRY and VANASKIE, <u>Circuit Judges</u>

(Opinion Filed:  February 11, 2011)
_____

OPINION
_____

BARRY, <u>Circuit Judge</u>

     The District Court granted in part and denied in part defendant's motion to

dismiss. After a bench trial of thirty-five days, the Court entered judgment in favor of

defendant on the remaining claims. Plaintiffs appeal the Court's decisions. We will affirm in part and reverse and remand in part.

## I.  FACTUAL BACKGROUND[1]

Weaver Nut Company ("Weaver Nut") distributes candy, nuts, and dried fruit. Ten years ago, E. Paul Weaver, III ("Weaver"), and Miriam Weaver, his wife (collectively the "Weavers"), owned Weaver Nut, but the company was in financial straits. For "many years" under Weaver's leadership, Weaver Nut "engaged in practices including below cost sales to customers, purchasing without regard to existing inventory and anticipated demand and sale of 'out of date' product." (R. at 58.) In the spring of 2001, Michael Reis, Sr. ("Reis"), learned about Weaver Nut's situation and told Lawrence Katz about it. Katz does business as the Summit Private Capital Group ("Summit"), and Katz proposed to Weaver that Weaver Nut and Summit enter into a Merchant Banking and Corporate Development Agreement ("Agreement"). The Agreement was executed by Weaver and Katz in the summer of 2001. Under its terms, Reis became the CFO of Weaver Nut; Reis, Katz, and Weaver received compensation; and Summit was entitled to certain payments, including a commission on the financing deals it arranged. By virtue of an option in the Agreement, Reis and Katz became shareholders in Weaver Nut, and by the end of 2001, they collectively owned one half of the company, and the Weavers owned the other half.

---

[1] The differences between the facts alleged in the amended complaint and the facts that the District Court found after trial are not material to our resolution of this appeal. We will, therefore, summarize the facts as found by the Court.

Reis began working at Weaver Nut in September of 2001 and was on site for approximately two weeks out of each month. He "was responsible for the day-to-day operations." (*Id.*) Katz, on the other hand, visited "every couple of months, or approximately six to eight times" during his involvement with the company. (*Id.* at 57.) During the period between late 2001 and early 2003, Katz "worked behind the scenes" to find business partners or acquisitions for Weaver Nut. (*Id.* at 58.) Reis and Katz helped Weaver Nut obtain a non-traditional line of credit that was "very time consuming and cumbersome," as well as "more expensive for the company than traditional bank financing." (*Id.* at 57.) Reis hired new employees, including more salespeople. Weaver Nut also put into place an inventory-control policy that required two signatures for every purchase order ("two-signature policy"), and although Weaver initially approved the policy, he later claimed that he did not and refused to follow it. Tensions between Weaver and Reis boiled over regarding the two-signature policy, and they sent contradictory letters to Weaver Nut's vendors regarding whether the policy was in place.

On March 26, 2003, Weaver sought legal advice from defendant Barley, Snyder, Senft & Cohen, LLC ("Barley Snyder"). Weaver told Barley Snyder about the Agreement, but when Weaver and his wife met with Barley Snyder on April 1, 2003, he "falsely advised [the Barley Snyder attorney] that Mr. Reis and Mr. Katz were not shareholders in the Company and that the stock warrants mentioned in the development agreement had not been exercised by them." (*Id.* at 60.) Barley Snyder asked Weaver

Nut's corporate counsel for the company's "corporate records," but counsel did not have them. (*Id.* at 60-61.) Weaver Nut and Barley Snyder could not find the "corporate records" because Reis took them from the company and, without telling Weaver, placed them in a safe deposit box; the documents in the safe deposit box included Weaver Nut's original share certificates.

Weaver consulted with Barley Snyder about terminating the Agreement and ending Weaver Nut's relationship with Reis and Katz, and Barley Snyder told Weaver that this "was an aggressive strategy which might lead to litigation." (*Id.* at 61.) Weaver nonetheless decided to move ahead and "end [Weaver Nut's] relationship with Messrs. Reis and Katz." (*Id.*) The partner at Barley Snyder who represented Weaver Nut, Weaver, and Miriam Weaver "reasonably believed that Barley Snyder was able to provide competent and diligent representation [to these three parties] at the same time because their interests were not adverse to one another, based upon Mr. Weaver's false representations that Messrs. Reis and Katz were not shareholders." (*Id.*)

Taking direction from Weaver as the President and sole director of Weaver Nut, and without consulting with Reis or Katz, Barley Snyder sent a letter to Reis and Katz on April 11, 2003, advising them that Weaver Nut was terminating the Agreement and "their employment with Weaver Nut Company." (*Id.* at 62.) Four days later, on April 15, 2003, Reis and Katz told Barley Snyder that they collectively owned half of the shares in Weaver Nut. Weaver denied this, and Barley Snyder recognized that ownership was in

4

dispute but could not independently investigate this issue "[b]ecause the corporate books and records were missing." (*Id.*) That same day, the parties met and agreed to hire an independent accountant "to take a look at the financial condition of the Company and to make recommendations." (*Id.* at 63.) The accountant identified a number of problems and recommended, among other things, replacing the financing that Reis and Katz helped Weaver Nut secure. He also "found numerous deficiencies" in parts of Weaver Nut's operation that were under Reis's supervision and "concluded that Weaver Nut Company was better off without the [Agreement] or the employment of Mr. Reis, Mr. Katz or the [other employees that Weaver fired around the same time]." (*Id.* at 65.)

Weaver and Weaver Nut then sued Reis, Katz, and Summit, and Reis, Katz, and Summit brought a shareholder derivative action against Weaver Nut and the Weavers. At that point, Barley Snyder informed Weaver Nut that it could no longer represent the Weavers and Weaver Nut due to the potential conflict of interest. Barley Snyder continued to represent the Weavers individually, but Weaver Nut retained other counsel. All litigation among Weaver Nut, the Weavers, Reis, and Katz was settled in December of 2003, and as part of the settlement agreement Weaver Nut assigned any claims it had against Barley Snyder to Reis and Katz.[2] The District Court concluded that Weaver breached the fiduciary duties that he owed to Reis, Katz, and Weaver Nut. The Court also

---

[2] The District Court wrote that "Weaver Nut Company assigned to Mr. Reis and Mr. Katz any claims the Company might have against Weaver Nut Company," (R. at 70.), but this clearly was a proofreading error. Reis and Katz released their claims against

found, however, that Barley Snyder did not *know* that Weaver "was breaching fiduciary duties to either the Company or to Messrs. Reis and Katz." (*Id.* at 69.)

After Reis and Katz were out of the picture, Weaver Nut hired a new CFO and obtained new financing that was less expensive than that which Reis and Katz had negotiated. Weaver Nut also saved money by cutting staff. The District Court concluded that "[t]he increases in operating costs implemented by Messrs. Reis and Katz offset the increase in gross profit margin that the Company enjoyed during their tenure" and that Weaver Nut "significantly decreased its operating costs" after Reis and Katz were no longer involved. (*Id.* at 68.) Even though sales fell, Weaver Nut "was more profitable in 2004, 2005 and 2006 than it had been in 2001-2003." (*Id.* at 69.) The defense expert, who testified that the firing of Katz and Reis caused no damages to Weaver Nut, was "credible and persuasive" while Katz's lay testimony regarding damages to Weaver Nut was "self-serving and unconvincing." (*Id.* at 79-80.) The Court ultimately "conclude[d] that there was no failure to act by Barley Snyder that was a factor in bringing about any damage to Weaver Nut Company and that the Company suffered no actual damages." (*Id.* at 78.)

## II. JURISDICTION AND STANDARDS OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367, and we have jurisdiction pursuant to 28 U.S.C. § 1291. Reis and Katz brought claims against Barley Snyder individually (the "individual claims") and on behalf of Weaver Nut as its

Weaver Nut, and Weaver Nut assigned to Reis and Katz any claims that it had against Barley Snyder. (*Id.* at 199-200.)

assignees. The Court dismissed all but one of the individual claims, and we exercise plenary review over that decision. After a bench trial, the Court granted judgment in favor of Barley Snyder on all remaining claims. As to the claims that went to trial, we exercise plenary review over the Court's legal conclusions and review factual findings for clear error. We review the Court's rulings regarding admission of evidence for abuse of discretion.

## III. ANALYSIS

### A. Motion to Dismiss

The District Court granted Barley Snyder's motion to dismiss five of the individual claims primarily because it predicted that the Supreme Court of Pennsylvania would hold that Reis's and Katz's release of their claims against the Weavers and Weaver Nut also released their agent, Barley Snyder, notwithstanding an agreement to the contrary in the release. After plaintiffs filed this appeal, however, the Supreme Court of Pennsylvania came to the opposite conclusion and held that "[i]n the scenario entailing a plaintiff's surrender of vicarious liability claims only and express preservation of claims against an agent, we hold that the parties to a settlement should be afforded latitude to effectuate their express intentions." *Maloney v. Valley Med. Facilities, Inc.*, 984 A.2d 478, 487 (Pa. 2009). The Court in *Maloney* specifically disapproved the opinion on which the District Court most directly relied, *Pallante v. Harcourt Brace Jovanovich, Inc.*, 629 A.2d 146 (Pa. Super. Ct. 1993).

7

Plaintiffs contend that we should reverse and remand the five dismissed individual claims for trial. We will affirm the dismissal of two of the individual claims on alternative grounds found by the District Court, affirm the dismissal of one claim on an alternative ground that was presented to the Court, and reverse the Court on two of the individual claims and remand them for further proceedings.

### 1.    Professional Negligence and Conversion

The District Court dismissed the individual claims for professional negligence and conversion on alternative grounds that plaintiffs acknowledged but did not address in their initial brief on appeal. The Court clearly stated those grounds, and plaintiffs waived any objection to them by failing to address them in their opening brief.[3] *See F.D.I.C. v. Deglau*, 207 F.3d 153, 169 (3d Cir. 2000). We, thus, will affirm the Court's dismissal of these claims.

### 2.    Abuse of Process

The parties do not dispute that the elements of an abuse of process claim in Pennsylvania are that the defendant "(1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed[,] and (3) harm has been caused to the plaintiff." *Rosen v. Am. Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. Ct. 1993). There is also no dispute that abuse of process is "concerned with a perversion of a process *after it is issued*," while "[m]alicious use of civil process has to do

---

[3] We, therefore, will not discuss the arguments that plaintiffs made for the first time in their reply brief.

with the wrongful *initiation* of such process." *McGee v. Feege*, 535 A.2d 1020, 1023 (Pa. 1987) (emphasis added). The plaintiffs assert a claim for abuse of process, but they did not allege any facts that could support a conclusion that Barley Snyder engaged in "a perversion of a process" *after* it filed the action at issue. We will therefore affirm the District Court's dismissal of the claim for abuse of process.

### 3.      Plaintiffs' Other Dismissed Individual Claims

The District Court dismissed plaintiffs' individual claims for breach of fiduciary duty and tortious interference with contractual relations ("tortious interference") solely on the basis of what turned out to be its erroneous prediction of Pennsylvania law. Barley Snyder contends that the Court's factual findings after the bench trial preclude plaintiffs from recovering on these individual claims. Plaintiffs respond that this approach is improper because the "trial court's *trial* findings [were] *on different counts against a different plaintiff.*" (Appellants' Reply Br. at 5.) They argue that we should apply the standard for a motion to dismiss and look only to the factual allegations they made in the amended complaint.

Neither side addresses the question of whether the District Court's factual findings as to Weaver Nut's claims should bind Reis and Katz and preclude them from pursuing their individual claims. Even a non-party may be "bound by the determination of issues" if he or she "controls or substantially participates in the control of the presentation on behalf of a party." *Marshak v. Treadwell*, 240 F.3d 184, 195 (3d Cir. 2001) (internal

9

quotation marks omitted); *see also Richards v. Jefferson County*, 517 U.S. 793, 798-99

(1996). This is a factual inquiry, and the Court is in a better position than we are to

address it in the first instance. *Ransburg Electro-Coating Corp. v. Lansdale Finishers,*

*Inc.*, 484 F.2d 1037, 1038 (3d Cir. 1973). We will therefore reverse the dismissal of the

individual claims for breach of fiduciary duty and tortious interference, and will remand

this case for an analysis of the preclusion issues and, if necessary, further proceedings on

these two individual claims.

### B.     Post-Trial Judgment

#### 1.      Damages to Weaver Nut

As to the claims that went to trial, we will first review the District Court's factual

finding that Barley Snyder did not cause damages to Weaver Nut. The Court granted

judgment in favor of defendant on Weaver Nut's claims for breach of fiduciary duty,

professional negligence, tortious interference, and breach of contract because, *inter alia*,

Barley Snyder caused no damages to Weaver Nut. Plaintiffs do not challenge the Court's

legal conclusion that Weaver Nut must show damages to succeed on each of these four

claims, but they contend that the Court erred in its factual finding that Weaver Nut

suffered no damages attributable to Barley Snyder.

Plaintiffs have not shown that the District Court committed clear error on this

issue, and we will affirm the judgment in favor of Barley Snyder on Weaver Nut's claims

for breach of fiduciary duty, professional negligence, tortious interference, and breach of

contract.[4]

## 2. Aiding and Abetting a Breach of Fiduciary Duty

For plaintiffs to succeed on their claims that Barley Snyder aided and abetted Weaver's breach of fiduciary duty under either Pennsylvania or New Jersey law, they must show that Barley Snyder knew that Weaver was breaching his fiduciary duty to Weaver Nut, Reis, and Katz. *Koken v. Steinberg*, 825 A.2d 723, 731 (Pa. Commw. Ct. 2003); *Judson v. Peoples Bank & Trust Co.*, 134 A.2d 761, 767 (N.J. 1957), *cited in State ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 904 A.2d 775, 782 (N.J. Super. Ct. App. Div. 2006). Plaintiffs argue that Barley Snyder should have known about the shareholder relationship and Weaver's breach, and that Barley Snyder was negligent in not conducting an independent investigation into the ownership of Weaver Nut. They have not, however, carried their burden of showing that the District Court committed clear error in finding that Barley Snyder did not *actually* know about Weaver's breach, and we will affirm the Court's judgment in favor of defendant on plaintiffs' claims – individually, and as Weaver Nut's assignees – for aiding and abetting.

---

[4] Because we will affirm the dismissal of the professional negligence claim due to the lack of damages to Weaver Nut, we need not address plaintiffs' claim that the District Court erred in applying the law of Pennsylvania, rather than New Jersey, and in finding that there was no joint venture.

The only individual claim that went to trial was that for aiding and abetting, which, as discussed below, we will affirm on other grounds. We will not address plaintiffs' arguments that the District Court erred in finding that Reis and Katz individually suffered no damages.

### 3. Preclusion of Testimony Regarding Other Conflicts of Interest

Plaintiffs challenge the District Court's decision to preclude testimony as to Barley Snyder's alleged conflict of interest regarding its representation of two other companies during the time that it represented Weaver Nut. The Court precluded this testimony because plaintiffs "[did] not have expert testimony to establish such a conflict," and the issues were complex enough to require expert testimony. (R. at 128, 137-38.) Plaintiffs argue that this evidence was relevant and should have been admitted, but they do not address the grounds for the Court's ruling or show that the Court abused its discretion in barring this evidence due to the lack of expert testimony. We will affirm the Court as to this issue.

## IV. CONCLUSION

We will reverse the District Court as to the individual claims for breach of fiduciary duty and tortious interference, and will remand those claims for further proceedings consistent with this Opinion. We will affirm the Court in all other respects.